**Roland Frank Breckenbury BERKELEY et al., Plaintiffs,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, a corporation, and Eagle Star Insurance Company, a corporation, Defendants.**

No. 80–71C2.

United States District Court,
W. D. Washington,
Seattle Division.

Aug. 28, 1975.

Roy J. Moceri, Reed, McClure, Moceri & Thonn, P.S., Seattle, Wash., for plaintiffs.

Robert V. Holland, Bogle & Gates, Seattle, Wash., for defendant Fireman's Fund Ins. Co.

John W. Sweet, Seattle, Wash., for Eagle Star Ins. Co.

## OPINION

BEEKS, Senior District Judge.

On December 12, 1968, the crab fishing vessel NORTH SEA broke apart while encountering gale winds and mountainous seas, and was lost off Sennet Point, Alaska. Poul Henning Beer-Hansen and Elmer Thomas Olsen, crew members, and Edwin T. Grabowski, master, perished. Benjamin Golodoff, crew member, survived.

At the time of the casualty the NORTH SEA was owned by Northern Fishing & Trading Company, Inc. (Northern). It had been demised to Aleutian King Crab, Inc. (Aleutian), and it was being operated by Grabowski under a sub-bareboat charter from Aleutian. Following the loss of the vessel, Northern, Aleutian and the executrix of Grabowski's estate joined in a petition for exoneration from or limitation of liability.[1] Golodoff and the personal representatives of the estates of Hansen and Olsen filed claims, subsequently settled, in the limitation action.

The present case, involving interpretation of marine insurance contracts, is here under the admiralty jurisdiction.[2] At issue is determination of the ultimate responsibility for the costs of defense and settlement of the Hansen, Olsen and Golodoff claims. The several plaintiffs herein (Lloyd's) defended the claims, negotiated and paid the settlements. The Hansen claim was settled for $112,500, of which plaintiffs paid $92,500. The Olsen claim was settled for $125,000, which Lloyd's paid in full. The Golodoff claim, also paid in full by Lloyd's, was settled for $35,000. Lloyd's incurred attorneys' fees of $51,931.21 in the defense of the three claims, and now seeks reimbursement from Fireman's Fund Insurance Company (Fireman's Fund) and Eagle Star Insurance Company (Eagle Star) for the costs of defense and settlement.

The matrix of insurance coverage from which this litigation is spawned may be described as follows. On February 1, 1968 underwriters at Lloyd's undertook employer's liability insurance. Insurance policies issued by Lloyd's are not of record herein. The record does, however, contain certificates numbered 63587 and 63589–91 issued by Voigt, Walker & Co., Inc. which evidence a layered scheme of insurance underwritten by Lloyd's, and which the parties agree represent Lloyd's coverage. These certificates are hereinafter referred to collectively as the "Lloyd's policy." Listed as assureds under the Lloyd's policy at the time of the loss of the NORTH SEA

1. *In the Matter of the Petition of Northern Fishing & Trading Co., et al.*, Civil No. 8348 (W.D.Wash., May 20, 1971), *affirmed*, 477 F.2d 1267 (9th Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973).

2. Although the complaint and the Pretrial Order contain conclusory allegations of diversity jurisdiction under 28 U.S.C. § 1332, the requisite showing of diversity of citizenship of the parties has not been made.

were Northern as owner, Aleutian as charterer, and Grabowski as sub-bareboat charterer of the NORTH SEA. The NORTH SEA, accordingly, was listed in the schedule of vessels.

The first layer of the Lloyd's policy, certificate No. 63587, contains a limit of liability of $10,000 on account of bodily injuries to or death of one or more persons as a result of any one accident. Also issued were certificates of additional coverage, Nos. 63588–91. Plaintiffs herein are underwriters of the top three layers, certificates Nos. 63589–91, with limits of $430,000/$530,000 in excess of $20,000/$20,000. Although the record does not conclusively so indicate, it may be presumed for purposes of this opinion that the difference between the amount of the Hansen settlement and the amount paid thereunder by plaintiffs was in fact paid by underwriters of certificates Nos. 63587–88, who chose not to join in this lawsuit.

Lloyd's policy, in full force and effect at the time of the loss of the NORTH SEA, provided:

"Underwriters do hereby agree with the employer named herein and referred to as the 'Assured', in the event a member of the crew of the fishing vessel named herein suffering accidental bodily injuries, including death resulting therefrom:

"1. TO INSURE said Assured against loss by reason of the liability imposed upon him by law for damages on account of such injuries and to pay and satisfy judgments finally establishing the Assured's liability in actions defended by the Underwriters, all subject to the limits of liability provided for herein; . . .

\*　　\*　　\*　　\*　　\*　　\*

"NO. 7 ENDORSEMENT

"It is understood and agreed that the following specified clauses of the Fishing Insuring Agreements form attached hereto are amended to read as follows:

"*Paragraph 1.* TO INSURE said Assured against loss by reason of the liability imposed upon him *as an employer* for damages on account of such injuries and to pay and satisfy judgments finally establishing the Assured's liability in actions defended by the Underwriters, all subject to the limits of liability provided for herein. It is expressly understood that any liability incurred by the Assured under any Workmen's Compensation Act is completely excluded under this certificate unless specifically endorsed hereon; . . ."

Lloyd's also agreed, in the event of personal injuries or death suffered by a member of the crew of the fishing vessel named in the policy,

"TO INVESTIGATE accidents involving said injuries, negotiate all settlements of claims made as may be deemed expedient by the Underwriters' representatives, and defend suits for damages, even if groundless, brought on account of such injuries in the name of the Assured and on behalf of the Assured, unless or until such Underwriters' representatives shall elect to effect settlement thereof . . ."

Lloyd's policy, with regard to the existence of other insurance provided as follows:

"OTHER INSURANCE: If the Employer carries any other insurance covering a claim covered by this certificate, the insurance provided herein shall be excess over any other valid and collectible insurance."

Also in effect at the time of the loss of the NORTH SEA was Workmen's Compensation and Employer's Liability Insurance Policy No. WC51841, issued to Aleutian [3] by Fireman's Fund. Endorsement No. 2 of the Fireman's Fund policy provided:

"It is understood and agreed that Coverage B (Employers' Liability) of this

---

**3.** Northern and Grabowski are not named as insureds in the Fireman's Fund policy. Nei-

ther is the NORTH SEA covered by express provision.

policy is cancelled and the following substituted therefor:

"TO INDEMNIFY[4] this employer against loss by reason of the liability imposed upon him by law for damages on account of such injuries to such of said employees as are legally employed wherever such injuries may be sustained within the territorial limits of the United States of America or the Dominion of Canada. . . ."

The limits of liability under the Fireman's Fund policy were $100,000 for claims arising out of bodily injuries to or death of any one employee from any one accident, with a maximum limit of $300,000 for claims arising out of bodily injuries to or death of more than one employee from any one accident.

With regard to the existence of other insurance, the Fireman's Fund policy provided as follows:

"11. Other insurance. If the insured has other insurance against a loss covered by this policy, the company shall not be liable to the insured hereunder for a greater proportion of such loss than the amount which would have been payable under this policy, had no other insurance existed, bears to the sum of said amount and the amounts which would have been payable under each other policy applicable to such loss, had each such policy been the only policy so applicable."

The Fireman's Fund policy also included the following provision:

"As respects the insurance afforded by the other terms of this policy the company shall:
"(a) defend any proceeding against the insured seeking such benefits and

any suit against the insured alleging such injury and seeking damages on account thereof, even if such proceeding or suit is groundless, false or fraudulent, but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient."

The remaining insurance policy in effect at the time of the loss of the NORTH SEA and at issue herein is Commercial Umbrella Liability Policy ESU100289 issued to Aleutian[5] by defendant Eagle Star. The Eagle Star policy provided as follows:

"I. COVERAGE. The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability
"(a) imposed upon the Insured by law, or
"(b) assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured, while acting in his capacity as such,
"for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of:

"(1) personal injuries, including death at any time resulting therefrom,
"(2) property damage,
"(3) advertising liability,
"caused by or arising out of each occurrence happening anywhere in the world."

---

**4.** This language manifests a modification from a liability policy (as per cancelled Coverage B) to an indemnity policy. Counsel do not address the issue of what effect, if any, this change might have with regard to Fireman's Fund's "Other insurance" clause, set forth *infra*. In light of disposition of the claim against

Fireman's Fund reached herein, however, it is not necessary to treat this issue.

**5.** Northern and Grabowski are not named as insureds in the Eagle Star policy. Neither is the NORTH SEA covered by express provision.

Items 5 and 6 of the Declarations in the Eagle Star policy provide:

"Amount of ultimate net loss to be borne by Insured in respect of each occurrence not covered by underlying insurances $10,000

"Limit of Liability:

"(a) Limit in all in respect of each occurrence: $1,000,000

"(b) Limit in the aggregate for each annual period where applicable: $1,000,000"

As to the existence of other insurance, the Eagle Star policy provided:

"L. OTHER INSURANCE. If other valid and collectible insurance with any other insurer is available to the Insured covering a loss also covered by this policy, other than insurance which is in excess of this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this policy subject to the terms, conditions and limitations of other insurance."

The foregoing is a summary of relevant provisions of the insurance policies in effect on the date of the loss of the NORTH SEA. Lloyd's claims for reimbursement against Fireman's Fund and Eagle Star will be treated separately.

## FIREMAN'S FUND

 It is Lloyd's contention that Fireman's Fund was the primary insurer and, as such, was obligated to defend against the claims of Hansen, Olsen and Golodoff, and to contribute to the settlement of the claims up to the limits of its coverage. Fireman's Fund asserts that the insured under its employer's liability

policy, Aleutian, was not the employer of Hansen, Olsen and Golodoff, and that, accordingly, Fireman's Fund did not cover the losses suffered and had no duty to defend against the claims.

After the claims of Hansen, Olsen and Golodoff had been settled, trial of remaining aspects of the limitation proceeding led to, *inter alia*, a finding that no relationship, employment or otherwise, existed among Northern, Aleutian and Grabowski beyond that of owner-charterer-sub-charterer. Accordingly, it is inferable that Grabowski, as sub-bareboat charterer, was the employer of Hansen, Olsen and Golodoff. Aleutian, the named insured under the Fireman's Fund policy, was not the employer of the crew of the NORTH SEA.[6] This fact, however, does not end the inquiry concerning the duty of Fireman's Fund to defend the claims, or the right of Lloyd's to reimbursement herein.

Under Washington law,[7] the duty to defend arises from the allegations of the complaint.[8] This is also the fair import of the contractual agreement to defend entered into by Fireman's Fund, whereby the company agreed to

"defend any proceeding against the insured seeking such benefits and any suit against the insured *alleging* such injury and seeking damages on account thereof, *even if such proceeding or suit is groundless,* false or fraudulent . . ." [Emphasis added.]

The claims of Hansen, Olsen and Golodoff were filed in response to the petition for exoneration from or limitation of liability filed by Northern, Aleutian and Grabowski. The claims must therefore be read in light of the allegations of the petition. In relevant part, the peti-

---

**6.** *See* note 13 *infra.*

**7.** The Lloyd's, Fireman's Fund and Eagle Star policies, insofar as they are at issue in this lawsuit, are contracts of marine insurance. Absent controlling federal law, the interpretation of contracts of marine insurance in an admiralty case will abide state law. *Wilburn*

*Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1969). *See also Irwin v. Eagle Star Ins. Co.,* 455 F.2d 827 (5th Cir.), *cert. denied,* 409 U.S. 852, 93 S.Ct. 118, 34 L.Ed.2d 95 (1972).

**8.** *Holland America Ins. Co. v. National Indemnity Co.,* 75 Wash.2d 909, 454 P.2d 383 (1969).

tion alleged that Northern was owner of the NORTH SEA, that Aleutian was charterer, and that Grabowski was sub-charterer. The petition offered no further details as to the nature of the charter from Northern to Aleutian, or the sub-charter from Aleutian to Grabowski.

The Hansen claim admitted that Northern was owner, and that Aleutian "had a contractual interest in and to the vessel, NORTH SEA," but denied such relationship absolved Aleutian of liability. The claim further admitted that Grabowski was operator of the vessel, but denied that he was sub-charterer.

The Olsen claim admitted that Northern was owner and that Aleutian was charterer, but denied, upon lack of sufficient information, that Grabowski was sub-charterer. The claim alleged, upon information and belief, that Northern was owner, Aleutian, charterer and Grabowski, master of the NORTH SEA at the time of its loss.

The claim filed by Golodoff in the limitation proceeding admitted that Northern was owner and that Aleutian "had a contractual interest in and to the vessel, NORTH SEA," but denied that such relationship absolved Aleutian of liability. The claim further admitted that Grabowski was the operator of the vessel, but denied that he was sub-charterer. In a previously filed complaint against Grabowski, Northern and Aleutian,[9] Golodoff had alleged that Northern was owner, Aleutian, operator and Grabowski, Captain of the NORTH SEA. The previously filed action was stayed pursuant to order of the Court pending resolution of the limitation proceeding.

The lack of specificity with which the alleged charter to Aleutian and sub-charter to Grabowski are treated in the petition and in the claims of Hansen, Olsen and Golodoff creates considerable ambiguity with regard to the nature of Aleutian's potential liability. Of the various possible combinations of charters and sub-charters that might be read into the ambiguous pleadings,[10] only the combination of a demise or bareboat charter from Northern to Aleutian and a non-bareboat charter (e. g., a time or voyage charter, or no charter) from Aleutian to Grabowski would give rise to the fair inference that Aleutian was employer of the crew of the vessel. There are no allegations in any of the claims filed in the limitation proceeding that expressly allege or give rise to the clear inference that Aleutian was employer of the crew of the NORTH SEA. Only the original Golodoff action, stayed pending the limitation suit to abide the result therein, stated a clear cause of action against Aleutian as employer, and the claim subsequently filed by Golodoff in the limitation suit served to obfuscate this allegation. Under the terms of its policy, of course, Fireman's Fund's only exposure was through liability of its insured, Aleutian, *as employer.*

With respect to determination of an insurer's duty to defend, it is Lloyd's contention that the allegations of the complaint must be liberally construed in favor of finding the allegations to state an action within the scope of coverage afforded by the policy. Accordingly, Lloyd's would have the Court find that notwithstanding the ambiguities of the claims, they were sufficient to alert Fireman's Fund that Aleutian might be liable as employer of Hansen, Olsen and Golodoff, and that Fireman's Fund thus had the duty to defend and participate in the settlement of the claims.

The Court does not dispute Lloyd's contention that there is a general rule favoring liberal interpretation of pleadings to construe allegations as being within the scope of coverage of an insur-

9. *Golodoff v. Grabowski, et al.,* Civil No. 8385 (W.D.Wash., April 2, 1971). The complaint therein was filed July 7, 1969. Golodoff filed his claim in the limitation action on August 12, 1969.

10. *See generally Poor, Charter Parties and Ocean Bills of Lading* (5th ed. 1968).

er having a duty to defend.[11] The purpose of this rule, however, is to relieve the insured from the burden of defense of marginal cases, and it is consistent with judicial policy of construing a contract of insurance narrowly against the insurer, the party generally responsible for drafting the provisions thereof.

This case does not present an appropriate situation for application of this rule of construction. Aleutian did not tender defense of the claims to Fireman's Fund; neither was Aleutian required to individually assume the defense. Although the record is incomplete, it appears that defense of the claims was voluntarily assumed by Lloyd's in its role as insurer of plaintiffs in the limitation proceeding. The losses alleged by claimants were clearly within the coverage of the Lloyd's policy. Lloyd's received a premium to insure Northern, Aleutian and Grabowski against liability arising out of injuries to or death of members of the crew of the NORTH SEA, and to assume the defense of such claims. In light of the allegations of claimants, and the fact that Northern, Aleutian, Grabowski and the NORTH SEA were all expressly covered by the Lloyd's policy, it was reasonable for Lloyd's to undertake defense and settlement of the claims. Having done so, however, Lloyd's cannot now hold Fireman's Fund to the standard of conduct to which Fireman's Fund would be held had it been tendered defense of the claims by its assured at the time of the filing of the claims.

Lloyd's did not tender defense of the claims to Fireman's Fund until March 30, 1970, after negotiation of the claim settlements.[12] At that time the record in the limitation proceedings contained more than the bare claims. Present in the records of this Court, to wit: the file in the limitation proceedings, at that time, were copies of the charter from Northern to Aleutian and the sub-bareboat charter from Aleutian to Grabowski. With the defense thus tendered at the eleventh hour, Fireman's Fund was entitled to examine the entire record, as it did, and was entitled to conclude, as it did, that Aleutian, having sub-bareboat chartered the NORTH SEA to Grabowski, was not an employer of the crew of that vessel.[13] Accordingly, Fireman's Fund was also justified in its conclusion that it was not an insurer of the losses suffered by claimants and that it had no duty to defend or participate in the settlement of the claims.

11. The rule has been stated thus:

" * * * Where the complaint does not state facts sufficient to bring the case clearly within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. In other words, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in the insured's favor."

Blohm v. Glens Falls Ins. Co., 231 Or. 410, 373 P.2d 412, 414–15 (1962). See also Annotation: Liability Insurer—Duty to Defend, 50 A.L.R.2d 458 at 504 (1956); 7 Am.Jur.2d, Automobile Insurance, § 162 at 495 (1963).

12. Paragraphs 17–19 of the Admitted Facts as set forth in the Pretrial Order state that the Hansen claim was settled on March 12, 1970, the Olsen claim on March 16, 1970 and the Golodoff claim on April 3, 1970, and that the amounts of the settlements were paid in full by plaintiffs on or about those respective dates (except for the Hansen claim, which plaintiffs paid less a $20,000 deductible, on or about April 3, 1970). Paragraph 21 of the Admitted Facts states that Fireman's was "aware" of the loss of the NORTH SEA and of the pending claims of Hansen, Olsen and Golodoff. This "awareness" is not the equivalent of a tender of defense. There is no evidence that Fireman's Fund was given formal notice of the claims or requested to assume the defense thereof until March 30, 1970.

13. The sub-bareboat charter from Aleutian to Grabowski states: "VIII SUB-BAREBOAT CHARTERER to hire own crew and be responsible for paying their shares and taxes." Further, the Admitted Facts as set forth in the Pretrial Order of the limitation proceeding, include the fact of the charter from Northern to Aleutian, the sub-bareboat charter from Aleutian to Grabowski, and the statement that ". . . neither Northern Fishing & Trading Company, Inc. nor Aleutian King Crab, Inc. did victual, supply, man or crew the NORTH SEA."

## EAGLE STAR

Lloyd's, having defended and settled the Hansen, Olsen and Golodoff claims on behalf of Northern, Aleutian, Grabowski and the NORTH SEA, contends that Eagle Star, insurer of Aleutian, is liable to it for a pro rata share of the costs of settlement. Although the Eagle Star policy provides coverage of personal injury and wrongful death liability imposed against its insured by way of settlement,[14] the circumstances of the settlement herein raise grave doubts as to whether any portion of the settlements can be reasonably and legally allocated to Aleutian.[15]

Lloyd's employer's liability policy provided coverage to all persons having an interest in the NORTH SEA, and specifically covered personal injuries to or death of crew members of that vessel. Named assureds in connection with the operation of the NORTH SEA were Northern as owner, Aleutian as charterer, and Grabowski as sub-bareboat charterer. Thus, in the event of injury to or death of a crew member of the NORTH SEA, Lloyd's insured the loss irrespective of whether the ultimate responsibility lay with Northern, Aleutian or Grabowski. Accordingly, it was reasonable for Lloyd's in its management of the defense on behalf of all three defendants to settle the claims of Hansen, Olsen and Golodoff.

The judgment of the Court in the limitation proceeding, reached pursuant to adjudication of a cross claim by the executrix of the estate of Grabowski against Northern and Aleutian, and subsequent to settlement of the Hansen, Olsen and Golodoff claims, was that the loss of the NORTH SEA solely resulted from negligence of the master, Grabowski. The Court's further finding, that no employment relationship existed among Northern, Aleutian and Grabowski, read in the context of the relevant charter parties and the Pretrial Order of that case,[16] leads to the inescapable conclusion that Grabowski alone was employer of the crew of the NORTH SEA and liable alone for damages sought on their behalf.

Thus, not only was the loss sustained of a kind specifically insured by Lloyd's, but the person primarily liable as employer and as tortfeasor, Grabowski, is a named insured of Lloyd's and not of Eagle Star. The outcome of the limitation proceeding conclusively absolves, as a factual matter, Aleutian of responsibility for the wreck of the NORTH SEA and the attendant injuries and loss of life.

It is also true that at the time of the settlement of the Hansen, Olsen and Golodoff claims, the absence of liability on the part of Aleutian was not a matter of certainty. Although the charter parties and the Pretrial Order in the court record at the time appeared to absolve Aleutian from liability as employer, Aleutian was exposed to potential liability as demise charterer of the NORTH SEA. That is, had the loss of the vessel been proximately caused by a condition of unseaworthiness that existed at the time of the sub-bareboat charter from Aleutian to Grabowski, liability might well have been laid at Aleutian's door. Lloyd's settlement of the claims was thus not totally unreasonable from the standpoint of Aleutian at the time settlement was consummated.

▋ Nonetheless, the circumstances of this case militate against the success of Lloyd's action for contribution from Eagle Star. Grabowski, insured only by

---

14. The Eagle Star policy provides:

"The term 'ultimate net loss' means the total sum which the insured, or any company as his insurer, or both, become obligated to pay by reason of personal injury . . . either through adjudication or compromise, and shall also include . . . expenses for . . . litigation, [and] settlement . . . of claims and suits which, are paid as a consequence of any occurrence covered hereunder . . . ."

15. Assuming *arguendo* that Lloyd's had authority to make allocation of the settlements amongst its named insureds, of which this Court entertains considerable doubt, there is nothing in the record from which this Court could determine what amount, if any, could be reasonably allocated to Aleutian.

16. *See* note 13 *supra*.

Lloyd's, was the person responsible for the losses suffered by claimants. The sub-bareboat charter from Aleutian to Grabowski provided that

> "The SUB–BAREBOAT CHARTERER shall indemnify and hold harmless the BAREBOAT CHARTERER against any claim arising out of the operation of the vessel by the SUB–BAREBOAT CHARTERER, except for negligence of the BAREBOAT CHARTERER."

Accordingly, the settlement of the Hansen, Olsen and Golodoff claims, insofar as they may have imposed a liability on Aleutian, would provide the basis for an action by Aleutian for indemnity against Grabowski. Since the settlements were paid by Lloyd's, insurer of both Aleutian and Grabowski, no such action is in the offing. Should, however, Eagle Star be required to contribute to Lloyd's settlements, then Eagle Star could probably succeed to Aleutian's right to indemnity against Grabowski, and, ultimately, against Grabowski's insurer, Lloyd's.

It is well settled that when two policies of insurance cover a loss, and one of them insures an employer liable only by respondeat superior, while the other covers the employee whose active negligence caused the loss, and where the employer has a right of indemnity against the negligent employee, the insurer of the employee must bear the entire loss.[17] The present case is analogous to the extent that Grabowski and Aleutian (as well as Northern) share liability under the settlements, although Grabowski alone is ultimately liable as employer and tortfeasor. Further, Aleutian has a contractual right of indemnity against Grabowski, and Grabowski is insured only by Lloyd's. The reasoning of the

cited cases is applicable herein, and requires that Lloyd's bear the entire cost of the claim settlements. It is not unreasonable to place this burden on the sole insurer of the sole tortfeasor, especially when the only potential source of liability against Aleutian, and hence, Eagle Star, is the settlement reached by Lloyd's in a posture that offered no inducement for Lloyd's to ascertain the individual liability, if any, of Aleutian.

Moreover, judgment for Eagle Star need not be grounded on this holding alone. The Eagle Star policy is a commercial umbrella policy, clearly designed as excess insurance. The Lloyd's policy, on the other hand, is a layered employer's liability policy, the first layer of which, certificate No. 63587, is primary. The upper three layers, certificates Nos. 63589–91, underwritten by plaintiffs herein, are subject to essentially the same terms and conditions as the primary layer.[18] The "other insurance" clause, as it applies to the top layers of the Lloyd's policy, is vitiated to the extent that it also appears in the certificate No. 63587, which is referred to in No. 63591 as the "primary" certificate. In other words, when a policy is written in layers to distribute the risk among several underwriters, but nonetheless is drafted as an interdependent unit, all of which purports to be excess but part of which is, in fact, primary, the excess character of the whole, including the top layers, is called into question.

It is a disfavored approach to resolve disputes among insurance carriers on the basis of a dogmatic reliance on the "other insurance" clauses of respective policies without regard to the intent of the parties as manifested in the overall pattern of insurance coverage.[19]

17. *Pacific Employers Ins. Co. v. Hartford Acc. & Ind. Co.*, 228 F.2d 365 (9th Cir. 1955), *cert. denied*, 352 U.S. 826, 77 S.Ct. 38, 1 L.Ed.2d 49 (1956); *Canadian Ind. Co. v. United States Fid. & Guar. Co.*, 213 F.2d 658 (9th Cir. 1954).

18. Lloyd's certificate No. 63591 representing the top layer of insurance states as follows: "MAINTENANCE OF PRIMARY INSURANCE: This Certificate is subject to the

same warranties, terms and conditions (except as regards the premium, the obligation to investigate and defend, the amount and limits of liability and the renewal agreements, if any, and except as otherwise provided herein) as are contained in or as may be added to the Certificate of the Primary Insurer(s) . . ."

19. *Allstate Ins. Co. v. Employers Liability Assurance Corp.*, 445 F.2d 1278 (5th Cir. 1971).

In the case at bar, although the policies of both Lloyd's and Eagle Star included a provision defining coverage as excess, it is apparent from both the language of the policies and the scheme of overall coverage contracted for by Aleutian and others connected with the NORTH SEA, that the Eagle Star policy was intended to provide the broad "umbrella" layer of secondary coverage.

First, the Lloyd's policy provided coverage for the specific risk of employer's liability arising out of injury to a crew member of the NORTH SEA, whereas the Eagle Star policy was of much broader scope. Second, the first layer of the Lloyd's policy was primary, including duties to investigate and defend, and is described as primary in the upper layer certificates. The Eagle Star policy, on the other hand, offered only secondary or excess coverage, limiting indemnity to the *insured's* share of "ultimate net loss." The policy defined ultimate net loss as including the sum which the insured, *or any company as his insurer, or both,* become obligated to pay by reason of an insured accident. Thus Eagle Star's liability was created subordinate to every other type of insurance afforded to its insured.[20] Additionally, Eagle Star's obligation is specifically described as secondary with regard to policies of underlying coverage named in the Eagle Star policy, as well as with regard to "other valid and collectible insurance."

Thus, it appears that Eagle Star's umbrella policy is more clearly designed as excess secondary coverage than is Lloyd's. Further, this view would accord with my understanding of the pattern of overall coverage. As stated by the Court of Appeals for the Fifth Circuit, "[w]hen insuring claims simply cannot be resolved by word-logic, courts should determine whether coverage priorities can be allocated in the light of total policy insuring intent."[21] It is my view that the Lloyd's policy was designed to provide specific coverage for liability arising out of operation of the NORTH SEA, as Aleutian's other underlying policies (named in the General Endorsement to the Eagle Star policy) were also designed to provide coverage of specific risks. In this context, it appears that the broad coverage of the Eagle Star policy was, as it states, a secondary umbrella layer of excess coverage. The coverage provided by Lloyd's herein not having been exhausted, the Eagle Star coverage cannot be reached.

For all of the reasons stated herein, the complaint of Lloyd's must be dismissed. The foregoing shall constitute my findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). The clerk shall enter judgment in accordance herewith with costs in favor of defendants.

---

20. *Id.* at 1283.

21. *Id.* at 1284.