The **MARYLAND CASUALTY COMPANY, Plaintiff,**

v.

**W.R. GRACE & COMPANY, Continental Casualty Company, Royal Indemnity Company, Aetna Casualty and Surety Company, and General Insurance Company of America, Defendants.**

**No. 83 Civ. 7451 (SWK).**

United States District Court, S.D. New York.

March 6, 1991.

---

Laura A. Foggan, Wiley, Rein & Fielding, Washington, D.C., for Maryland Cas. Co.

Randy Paar, Anderson Kill Olick & Oshinsky, P.C., New York City, for defendant W.R. Grace & Co.

Stuart C. Levene, Ford Marrin Esposito & Witmeyer, New York City, for defendant Continental Cas. Co.

James P. Donovan, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for defendant Royal Indem. Co.

James E. Rocap, III, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for defendant Aetna Cas. & Sur. Co.

Albert D. Brault, Brault, Graham, Scott & Brault, Rockville, Md., for defendant General Ins. Co. of American.

TABLE OF CONTENTS PAGE

Background .................................................... 1209
Discussion
 Summary Judgment ........................................ 1213
 Trigger of Coverage for Bodily Injury Claims ............................ 1213
 Coverage for Knowing Misconduct ...................................... 1217
 Punitive Damages ......................................... 1219
 Duty to Defend Upon Exhaustion of Limits ............................... 1220
 Limitation of Coverage to Sums Payable as Damages and Limitation of Coverage to Claims for Property Damage ...................................... 1221
 Trigger of Coverage for Public Building and School Claims ................ 1224
 Exclusion for Insured's Own Product ................................... 1226
 Sistership ......................................... 1227
 Special Limits Provisions in Maryland's Policies ......................... 1228
 Proof of Existence of Terms of Policies ............................... 1229
 Coverage for Subsequent Acquisitions ................................... 1230
 Policies issued to predecessors (Identity of the insured) ................ 1233
 Scope of "Accident" Policies Coverage ................................. 1236

## OPINION

BERNIKOW, United States Magistrate Judge:

This case, like many others across the country, involves a dispute between an insured and insurers concerning coverage for underlying asbestos personal injury and property damages cases.[1] The parties' motions for partial summary judgment are now before the court.[2]

## BACKGROUND

Maryland Casualty Company ("Maryland") initially brought this declaratory judgment action, based on diversity of citizenship, against W.R. Grace & Co. ("Grace") and CNA, concerning its obligations to defend and indemnify Grace under Maryland's comprehensive general liability ("CGL") insurance policies issued to Grace between 1955 and June 30, 1973, in regard to asbestos-related bodily injury and property damage lawsuits. These underlying lawsuits are "part of the national 'asbestos scene, an unparalleled situation in American tort law,' in which many thousands of personal injury claims have been filed 'against asbestos manufacturers and producers.'" *Racich v. The Celotex Corp.*, 887 F.2d 393, 394 (2d Cir.1989) (quoting *In re School Asbestos Litigation*, 789 F.2d 996, 1000 (3d Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986)).

As of November 3, 1987, over 6,400 asbestos-related lawsuits have been filed against Grace for bodily injury arising out of exposure to asbestos or asbestos-containing products manufactured or sold by Grace or its predecessors. Posner November 13, 1987 affidavit at ¶ 19. Grace has also been sued in 134 cases that seek damages for property damage resulting from asbestos-containing products that were installed in various buildings throughout the country from the mid-1940's until the 1970's. Posner June 1, 1987 affidavit at ¶ 14.

In its answer, filed on January 27, 1984, Grace asserted various counterclaims in-

---

1. This case was referred to the undersigned with the consent of the parties, pursuant to 28 U.S.C. § 636(c).

2. All parties but defendant Continental Casualty Company ("CNA") have moved for summary judgment.

cluding those seeking a declaratory judgment regarding Maryland's duty to defend and indemnify. On April 30, 1984, Grace started an action against the Royal Indemnity Company ("Royal") in the District of Columbia Superior Court for the same declaratory relief it sought against Maryland. Grace later amended its District of Columbia complaint to add Aetna Casualty and Surety Co. ("Aetna") and the General Insurance Company of America ("General") as defendants. On June 21, 1984, Maryland successfully moved in this court to join Royal, Aetna and General as additional defendants.

Grace, a Connecticut corporation, with its principal place of business in New York, is primarily engaged in the chemical business on a worldwide basis and in energy-related natural resource activities. Posner 5–29–87 affidavit at ¶ 3. Maryland, a Maryland corporation, has its principal place of business in Baltimore, Maryland.

CNA, an Illinois corporation, has its principal place of business in Chicago, Illinois. Royal is a Delaware corporation, with its principal place of business in Charlotte, North Carolina. Aetna, a Connecticut corporation, has its principal place of business in Hartford, Connecticut. General is incorporated in the State of Washington and has its principal place of business in Seattle, Washington. Maryland, CNA, Royal, Aetna and General are engaged in the business of providing and underwriting insurance, including the extension of liability insurance coverage. Of the five insurers, only Maryland and CNA issued policies to Grace

itself. The other carriers allegedly issued policies to companies subsequently acquired by Grace.

Grace, in its own name, purchased policies from Maryland from 1955 to 1973, though Maryland denies that it provided continuous coverage for that period. Maryland notes that Grace has produced no primary policies in effect during the early years of the alleged period of coverage. The policies for the period from June 30, 1962 through June 30, 1970, Maryland asserts, are incomplete and, in some cases, fragmentary. Thus, Maryland has placed in issue the extent of its obligation to Grace for any asbestos-related claims arising before the periods for which any policies or policy fragments have been discovered and for the period as to which no complete policies have been discovered. Grace contends that it has located the originals of the policies, which include the missing pages, thus resolving Maryland's argument about missing pages.

Maryland also notes that its policies with Grace were negotiated in New York City between its own representatives and those of Grace. The policies, Maryland adds, were not the standard forms used in the insurance industry, but were individually tailored and negotiated "manuscript" policies, whose provisions were authored by Grace or by its brokers, and not by Maryland. Nonetheless, as Grace notes, a comparison of Maryland's policy language with the standard comprehensive general liability ("CGL") forms shows that the language is essentially the same.[3] Indeed, the man-

---

3. Under the Maryland–Grace policies, Maryland agrees:

> Coverage A—Bodily Injury Liability To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident.
>
> Coverage B—Property Damage Liability To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

Exh. # B, tab 1, to Maryland's Memo in Support of Motion. Endorsements deleted the words

"and caused by accident" and substituted the word "occurrence" for the word "accident" under Coverage A. *Id.* at tab 2.

The standard CGL policy requires an insurer to indemnify an insured for all damages that result from "bodily injury or property damage to which [the] policy applies caused by an occurrence." *See, e.g., Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119, 122 (D.C.Cir.1986).

In 1966, the insurance industry redrafted the standard CGL policy. *American Home Products Corp. v. Liberty Mutual Ins. Co.,* 565 F.Supp. 1485, 1501 (S.D.N.Y.1983), *aff'd as modified,* 748 F.2d 760 (2d Cir.1984). Prior to 1966, CGL policies covered liability, as set forth above in Coverage A, because of bodily injury *caused by accident. Id.* "The word 'accident' suggested an intent to cover only sudden, unexpected, but

aging director of the broker, Marsh & McLennan, Inc., involved in the negotiation and placement of the Maryland policies sold to Grace from at least June 30, 1961, through June 30, 1973, stated in an affidavit that the policies from June 30, 1961 to June 30, 1967 were standard form CGL policies, not drafted by Grace. *See* Keating November 16, 1987 affidavit at ¶ 3. He recognized that the policies from June 30, 1967 to June 30, 1973, were "manuscript" policies, but, he added, the language contained in them was taken from the standard form CGL policy.[4] *Id.* at ¶ 4.

With respect to the other insurers, Grace alleges that it, or various asbestos companies that it acquired, purchased CGL policies from Royal for all or part of the period from April 1, 1950 to April 1, 1963 and from May 26, 1967 to March 26, 1968. As for General, Grace alleges that General sold CGL coverage to Vermiculite Northwest, a company acquired by Grace in 1966, from June 1, 1961 to June 1, 1967. Grace also contends that Aetna sold CGL policies to companies acquired by Grace from January 31, 1951 until January 1, 1970. Grace does not possess copies of these policies, but asserts it has secondary evidence proving the existence of this coverage. Lastly, CNA directly sold CGL coverage to Grace from 1973 to the present.

In regard to the motions for partial summary judgment, Maryland requests relief in the form of a judgment declaring that:

(i) Maryland Casualty has no duty to indemnify or defend Grace for periods as to which the existence and terms of Maryland Casualty–Grace policies have not been proven by clear and convincing evidence;

(ii) Maryland Casualty has no duty to indemnify or defend Grace (a) under pre–1963 policies or (b) for liability involving products of any company acquired by or merged with Grace until after the date on which such company was acquired by or merged with Grace and insured under a Maryland Casualty policy;

(iii) Maryland Casualty has no duty to indemnify or defend Grace for liability for asbestos-related bodily injury claims as to which injury in fact occurred outside Maryland Casualty's policy periods;

(iv) Defense costs in each asbestos-related bodily injury case against Grace must be shared by all insurers as to which responsive policies have been proven except where it can determined that the injury in fact occurred outside of the policy period or periods of an insurer or that the claimed injury could not have resulted from exposure to a product manufactured by an insured under the relevant policy or policies;

(v) Maryland Casualty has no duty to indemnify or defend Grace for liability for asbestos-related claims for equitable or declaratory relief or any relief other than the award of damages;

(vi) Maryland Casualty has no duty to indemnify or defend Grace for liability for claims against Grace by school districts or other building owners ("school asbestos cases") seeking to recover the costs allegedly incurred, or to be incurred, by them in testing their buildings for the presence of asbestos insulation, and removing or encapsulating such insulation or taking other prophylactic or preventive measures with respect to such buildings and such claims do not seek compensation for property damage;

(vii) Maryland Casualty has no duty to indemnify or defend Grace for liability for school asbestos cases to recover for strictly monetary injuries not constituting compensation for property damage;

(viii) Maryland Casualty has no duty to indemnify or defend Grace for liability for school asbestos cases to recover for damage to Grace's products;

identifiable events." *Id.* The industry substituted the word "occurrence" for the word "accident" and "expressly provided that an occurrence included any injury or damage that resulted, not only from an accident, but also from injurious exposure over an extended period." *Id.*

4. The affidavit of an underwriter at Maryland, which indicates that the 1967–73 policies were manuscript policies, *see* second Gallt affidavit at ¶ 2, does not undermine the Keating affidavit.

(ix) Maryland Casualty has no duty to indemnify or defend Grace for liability for school asbestos cases because those cases seek to recover for hazards that were discovered or manifested subsequent to any Maryland Casualty policy periods;

(x) Any duty of Maryland Casualty to indemnify Grace for any asbestos-related property damage claims that may be found by the Court is limited by policy endorsements restricting liability for "continuous discharge ... of ... materials";

(xi) Maryland Casualty has no duty to indemnify Grace for liability for injuries that were not "unexpectedly," "unintentionally," or "accidentally" caused including, but not limited to, the *City of Greenville* case;

(xii) Maryland Casualty has no duty to indemnify Grace for any award of punitive damages, sanctions, fines or penalties imposed upon Grace.

Maryland Casualty further requests relief in the form of a judgment ordering Aetna, Royal and General, to the extent that Grace is able to establish that those insurers afforded responsive coverage, to reimburse Maryland Casualty for past costs of defending Grace in the asbestos-related bodily injury cases against Grace and to share with Maryland Casualty and CNA in those expenses in the future, except where it can be determined that the injury in fact occurred outside the policy period or periods of any insurer or that the claimed injury could not have resulted from exposure to a product manufactured by an insured under the relevant policy or policies.[5]

Grace has moved for partial summary judgment seeking a declaration that each of the policies sold by Maryland, Royal and General is obligated to indemnify Grace for asbestos-related property damage claims if the policy was in effect during any portion of the continuous damage process, from the first installation of the asbestos products through containment or removal. Grace seeks a similar declaration from the same insurers concerning asbestos-related bodily injury claims if the policy was in effect during any portion of the continuous injury process from first inhalation of asbestos fibers through manifestation of the asbestos-related disease.

Grace also seeks summary judgment requiring the carriers to pay all past, present and future defense costs. Further, Grace seeks a declaration that any triggered policy provides full and complete defense and indemnity coverage. In addition, Grace requests judgment against Maryland, Royal and General, jointly and severally, for the monies already expended by Grace to defend the asbestos-related cases, and to satisfy any judgments or settlements in those cases. Grace has not filed any claims against CNA and its motion for summary judgment is not directed against CNA.

Royal seeks partial summary judgment, declaring that Grace is not entitled to any CGL coverage issued by Royal to one of Grace's predecessor companies, the Zonolite Company ("Zonolite"). Royal never issued any policies to Grace. Royal also moves for summary judgment declaring that its defense obligation will terminate upon the exhaustion of the limits of its pre–1966 policies. Should the court find that Royal owes Grace a defense, Royal seeks guidance concerning the proper trigger of coverage for the asbestos-bodily injury cases pending against Grace.

Aetna seeks partial summary judgment declaring that Grace is not entitled to a defense under a policy issued to a predecessor company until it is shown that the claimant alleges injury or damage arising

---

**5.** Maryland has participated in the defense of Grace in underlying bodily injury actions. CNA provided or paid for Grace's defense in the underlying actions through July 31, 1990, when it exhausted the indemnity limits of all its applicable primary policies. CNA estimates its costs for defending Grace have exceeded $100 million. Recently, CNA moved to amend its answer to assert the defense that its policy limits have been exhausted and to assert counterclaims against Maryland and cross-claims against Royal, Aetna and General for indemnity and contribution for the costs it paid in providing Grace with defenses in the underlying actions.

out of asbestos products distributed by that predecessor company. Aetna seeks similar relief regarding its duty to indemnify Grace. Aetna also requests a declaration that the Illinois statute limiting the time during which actions may be brought by or on behalf of dissolved corporations bars Grace from seeking coverage under policies that may have been issued to California Zonolite Company ("California Zonolite") and Ari–Zonolite Company ("Ari–Zonolite"). Aetna, like Royal and General, did not issue any policies to Grace. Grace alleges that Aetna issued policies to three predecessor companies of Grace, i.e., California Zonolite, Ari Zonolite and Western Mineral Products ("Western Mineral"). No party, however, has produced copies of any of these policies and Aetna disputes the existence of the policies. It seeks summary judgment in the event the policies are shown to exist. We have not considered those issues unique to Aetna. They will be considered when, and if, Grace establishes the existence of the policies. A number of issues, however, that concern Aetna involve the other insurers and the determination of those issues will affect Aetna.

General seeks summary judgment on Grace's cross-claim, which asserts that General is obligated to fully defend and indemnify Grace under policies issued to General's former insured, Vermiculite–Northwest, Inc. ("Vermiculite Northwest"). Like Royal and Aetna, General seeks a declaration that it has no duty to Grace until Grace shows that the underlying claims implicate a product of Vermiculite–Northwest.

The insurers, other than CNA, also ask for a declaration that, to the extent the underlying suits do not seek damages, no coverage is afforded for them under the policies at issue. In other words, coverage does not apply, according to the insurers, to suits that seek other forms of relief, such as declaratory or equitable relief.

DISCUSSION

*Summary Judgment*

The general principles concerning summary judgment have become familiar. Fed.R.Civ.P. 56(c) authorizes summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The moving party bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). And all factual inferences, and ambiguities, are drawn against the moving party. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). The court's function on a motion for summary judgment is not to try issues of fact, but to determine whether there are any genuine issues of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Furthermore, under Rule 56(e), "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

*Trigger of Coverage for Bodily Injury Claims*

The first issue the parties raise concerns the trigger of coverage for bodily injury claims. The insurer "on the risk" at the triggering time must provide coverage. *Eagle–Picher Industries v. Liberty Mutual Ins. Co.*, 523 F.Supp. 110, 111 (D.Mass. 1981), *modified on other grounds*, 682 F.2d 12 (1st Cir.1982). This issue "usually arises when several different insurers have, in sequence, insured a company whose products caused injuries at different or uncertain times." *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1387 (E.D.N.Y.1988). Maryland argues that the bodily injury claims and, for that matter, the property damage claims, fall outside its policy periods and, thus, its policies are not triggered.

Citing *Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) (*"Keene"*), Grace

argues that all policies on the risk during the continuous bodily injury process, from first exposure to asbestos through manifestation of the asbestos-related disease, must pay in full Grace's legal liability for all asbestos-related bodily injury claims and lawsuits against Grace. In *Keene*, the court rejected the manifestation theory, which requires manifestation of injury during the policy period, as the only trigger of coverage in delayed manifestation cases. *Id.* at 1046. Inhalation exposure (exposure to asbestos dust) and exposure in residence (the subsequent development of the disease) also trigger coverage, the *Keene* court found. *Id.* The *Keene* court concluded that once triggered, each policy on the risk covered the insured's liability. *Id.* at 1048.

In *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 565 F.Supp. 1485 (S.D.N.Y.1983), *aff'd as modified*, 748 F.2d 760 (2d Cir.1984) ("*AHP*"), however, Judge Sofaer, applying New York law,[6] rejected the conclusions reached in *Keene*. Instead, Judge Sofaer determined that actual injury triggers coverage. *Id.* at 1489. Grace argues that *AHP* does not apply here because that case involved six different pharmaceutical products, not asbestos. *See AHP*, supra, 565 F.Supp. at 1490 n. 1. If any doubt existed as to *AHP*'s applicability to asbestos in New York, *Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119, 124–25 (D.C.Cir.1986), put it to rest. The same court that decided *Keene*, after examining the applicable New York case law applied *AHP* to asbestos. *Id.* at 125. The court also noted that *Keene* did not purport to apply New York law. *Id.* at 124. Not only that, the *Abex* court's own reading of the policy language, which it termed unambiguous, agreed with the result in *AHP*. Still, Grace contends that *Abex* should have

relied on New York state cases, and not on *AHP*.

Grace makes much of *National Casualty Ins. Co. v. City of Mount Vernon*, 128 A.D.2d 332, 515 N.Y.S.2d 267 (2d Dep't 1987), decided after *Abex. Mount Vernon*, Grace says, applied a continuous trigger, citing *Keene*. In *Mount Vernon*, a dispute about coverage, the underlying action concerned a suit against the city for false arrest and false imprisonment. The insurance company in that case denied coverage to the city because the arrest at issue occurred about a year and a half before the policy's effective date of January 1, 1983. The court found, however, that the insurance company had a duty to defend and indemnify the city for the damages sustained by the claimant in the underlying suit as a result of his incarceration on and after January 1, 1983 until his release, some seven days later. 515 N.Y.S.2d at 271. This finding by the Appellate Division modified the lower court's ruling that required the insurance company to defend and indemnify without regard to the policy date. What is more, the Appellate Division said: "the operative event triggering exposure, and thus resulting in coverage under the policy, is the sustaining of a specified injury during the policy period." *Id.* at 270.

The principal dispute in *Mount Vernon* concerned the meaning of the term "occurrence." The Appellate Division rejected the insurance company's position that the term refers to the precipitating event—the arrest—that gave rise to the injury. 515 N.Y.S.2d at 270. The *Mount Vernon* policy language, like the language here, said that occurrence means an event that results in personal injury sustained during the policy period. *Id.* Therefore, the court was not concerned with whether the causa-

**6.** Maryland contends that New York law governs this case with respect to its policies with Grace. Maryland notes that Grace has its principal place of business in New York and the policies were obtained through a New York broker and issued, delivered and administered through Maryland's New York office. *See W.R. Grace & Co. v. Continental Casualty Co.*, 896 F.2d 865, 873 (5th Cir.), *reh'g. denied*, (5th Cir. 1990); *W.R. Grace & Co. v. Hartford Accident* *and Indemnity Co.*, 407 Mass. 572, 555 N.E.2d 214, 221 (1990). Grace disputes that New York law governs, but says that the result is the same, regardless of whether New York's law controls. Nevertheless, Grace cites, for the most part, New York cases. Thus, we apply New York law to the Maryland–Grace issues. *See Alfin, Inc. v. Pacific Ins. Co.*, 735 F.Supp. 115, 118 (S.D.N.Y. 1990).

tive event happened before or during the policy period. *Id.* The policy did not require that the injury resulting from that event occur at one fixed time. *Id.* Nor did the policy distinguish between injuries that are continuous and the more common type of injuries that are not. *Id.* *See also Keene,* 667 F.2d at 1049. The Appellate Division cited *Keene*—with a "cf."—for the proposition that the failure to distinguish between continuous and non-continuous injury has particular significance because of express policy language that injury can be caused by " 'continuous or repeated exposure to conditions.' " *Mount Vernon,* 515 N.Y.S.2d at 270 (quoting policy); *see also Keene,* 667 F.2d at 1049 n. 31.

Thus, we do not read *Mount Vernon's* reference to *Keene* as an adoption of its continuous trigger theory. Moreover, *Mount Vernon,* as noted, held that a specified injury during the policy period triggers coverage, *see W.R. Grace & Co. v. Continental Casualty Co.,* ("*W.R. Grace & Co.*"), 896 F.2d 865, 876 (5th Cir.), *reh'g. denied,* (5th Cir.1990)—a result consistent with *AHP's* injury-in-fact trigger.

Grace also argues that other New York State cases support a continuous trigger theory. Nevertheless, *Abex* considered most of the cases Grace cites[7] and found that, though these cases did not offer a "unambiguous embrace" of the injury-in-fact theory, they were far more consistent with that theory than with the continuous trigger. *Abex,* 790 F.2d at 126. Similarly, the court in *Aetna Casualty & Surety Co. v. Abbott Laboratories, Inc.,* ("*Abbott*") 636 F.Supp. 546, 550 (D.Conn.1986), a case involving the drug DES and some policies covered by New York law, applied *AHP's* injury-in-fact trigger. More recently, Judge Weinstein observed that the federal courts applying New York law adopt the injury-in-fact theory under a comprehensive general liability policy. *Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1387–88 (E.D.N.Y.1988). And even more recently, the Fifth Circuit noted that New York follows the injury-in-fact theory. *W.R. Grace & Co.,* 896 F.2d at 875–76. Accordingly, we find that injury-in-fact triggers coverage in New York.

■ Grace argues, however, that extrinsic evidence is necessary to interpret the policy language at issue. The disparate constructions placed by courts on the same policy language, according to Grace, shows ambiguity as a matter of law. Grace further notes that it did not draft the disputed language. Following *Abex* and *AHP,* however, we find the policy language is unambiguous. Grace maintains that *AHP* did not involve asbestos. Nevertheless, *Abex* involved asbestos and the court there said:

> The plain language of the definition of "occurrence" used in the CGL policy requires exposure that "results, *during the policy period,* in bodily injury" in order for an insurer to be obligated to indemnify the insured. The unambiguous meaning of these words is that an *injury*—and not mere exposure—must result *during the policy period.*

790 F.2d at 127 (emphasis in original);[8] *see also AHP,* 748 F.2d at 765. Thus, extrinsic evidence need not be considered.

■ On the question of when injury in fact occurs, Grace argues that the asbestos-related bodily injuries in the underlying cases are inherently continuous, and, thus, even under *AHP,* each carrier on the risk at any time between first exposure and manifestation has the duty to indemnify. Maryland, for its part, urges that we follow

---

7. *Abex* recognized that *Allstate Ins. Co. v. Colonial Realty Co.,* 121 Misc.2d 640, 468 N.Y.S.2d 800 (Sup.Ct., Queens Co.1983), cited by Grace, adopted the exposure theory, but felt that this lower court decision did not send a clear signal in the face of other courts' doubts concerning that theory. *Abex,* 790 F.2d at 126 n. 33.

8. The CGL policy in *Abex* defined "occurrence" as follows: "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." 790 F.2d at 122. In the present case, the typical policy defines "occurrence" as "an event, or continuous or repeated exposure to conditions, which unexpectedly causes injury during the policy period." Exh. A. to 6–1–87 Posner affidavit. These two definitions contain no meaningful differences. Other policies in this case contain similar language.

Judge Sofaer's approach of establishing the timing of injury in fact on a case-by-case basis in the underlying actions. *See AHP*, 565 F.Supp. at 1509. We agree with Maryland. Though Grace argues that the etiology of asbestos-induced diseases is well known, the issue, according to the *Abex* court, has split the circuits. *Abex*, 790 F.2d at 127 n. 36. *Abex* contrasted *Insurance Co. of N.Am v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1218 (6th Cir.1980), *clarified*, 657 F.2d 814, (6th Cir. 1981) *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), which observed that injury, in the sense of tissue damage, occurs shortly after the initial inhalation of asbestos fibers, with the view of *Eagle–Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 19 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983), that even sub-clinical injury to the lung does not occur simultaneously with the inhalation of asbestos. *Id.*

In *AHP*, Judge Sofaer also recognized the difficulty in determining the onset date of asbestos injury. Commenting about the usefulness of collateral estoppel on medical issues to prove when injury occurred, Judge Sofaer excluded asbestos from the operation of that doctrine. *See* 565 F.Supp. at 1509. He said: "Unlike the variable manner in which injuries are caused by asbestos fibres, other products may produce specific consequences at particular times." *Id.* Accordingly, summary judgment is inappropriate on this issue, the resolution of which is better left to the underlying cases. *See AHP*, 565 F.Supp. at 1509; *Abbott*, Civil No. H–82–843 (JAC) slip op. at 2 (D.Conn. September 11, 1987); *Abbott*, 636 F.Supp. at 551. In those cases the courts will likely address related factual issues concerning the injuries at issue. *Abbott*, slip op. at 2.

■ With regard to those cases that have settled, the court hearing the coverage dispute—this court—should determine the date of the injury in fact. *Abbott*, 636 F.Supp. at 551–52. In *Abbott*, the court directed the parties confer to develop a procedure for resolution of the settled

cases. *Id.* at 551. The present parties should do the same. The fact of settlement, though, does not create coverage. In other words, an insurer has no duty to indemnify a settled claim excluded by the policy. *Uniroyal*, 707 F.Supp. at 1379. The duty to indemnify requires a covered loss under the policy. *Servidone Construction Corp. v. Security Insurance Co.*, 64 N.Y.2d 419, 423, 488 N.Y.S.2d 139, 143, 477 N.E.2d 441, 445 (1985); *see W.R. Grace & Co.*, 896 F.2d at 874 (citing *Servidone*); *Uniroyal*, 707 F.Supp. at 1379 (citing *Servidone*). In determining whether a settled claim involves a covered loss—from the actual facts, not the pleadings—the burden rests with the insurer to show that the claim was not within the policy coverage. *Servidone*, 488 N.Y.S.2d at 143, 477 N.E.2d 445; *Burroughs Wellcome Co. v. Commercial Union Ins. Co.*, 713 F.Supp. 694, 699 (S.D.N.Y.1989). An argument can be made that placing the burden on the insurer only applies to cases, like *Servidone*, involving a policy exclusion. 488 N.Y.S.2d at 143, 477 N.E.2d at 445. But the first paragraph of the *Servidone* opinion, which summarizes the court's holding, imposes no such limitation. 488 N.Y.S.2d at 140, 477 N.E.2d at 442. *Burroughs Wellcome*, too, did not limit its finding. 713 F.Supp. at 699; *see also Uniroyal* (*Servidone* "never held that an otherwise covered claim, once settled, must be proven anew by the insured.") 707 F.Supp. at 1379.

■ On the duty to defend, the insured's burden is not great. Grace is entitled to a defense if the complaints in the underlying actions " 'permit proof' of the facts establishing coverage, or if the complaints do not exclude the possibility that injury-in-fact occurred during the policy period. Only if the insurers establish, 'as a matter of law, that there is no possible factual or legal basis on which the insurer might eventually be obligated to indemnify,' would they escape their duty defend [Grace]." *Abex*, 790 F.2d at 129 (footnotes omitted) (emphasis in original); *see also Avondale Indus. Inc. v. Travelers Indemn. Co.*, 887 F.2d 1200, 1205 (2d Cir. 1989), *reh'g denied*, 894 F.2d 498 (2d Cir.)

(per curiam), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). Thus, the insurers must satisfy their obligation to defend Grace. *Id.* "This obligation will continue until the insurers establish that, as a matter of law, there is no possibility that they will have to indemnify [Grace]." *Id.* For those policies, then, that Grace has proven, or will prove, Maryland must provide a defense, *see Abex Corp. v. Maryland Casualty Co.,* No 82–2098, slip op. at 2 (D.D.C. April 6, 1990), provided those policies have been triggered applying the injury in fact trigger.

■ As for allocating defense costs among the insurers, which Maryland urges, those costs should be apportioned equally. *Federal Insurance Co. v. Cablevision Systems Development Co.,* 836 F.2d 54, 57 (2d Cir.1987); *Abex Corp. v. Maryland Casualty Co.,* No. 82–2098, slip op. at 3 (D.D.C. April 5, 1990). Nonetheless, summary judgment appears premature because the existence of coverage concerning all the insurers remains an open issue. *See* Proof of Existence of Terms of Polices, *infra.*

### Coverage for Knowing Misconduct

■ Maryland seeks summary judgment declaring that it has no duty to indemnify Grace for injuries that were not unintentionally caused. Grace, on the other hand, seeks a declaration that any triggered policy provides full and complete defense and indemnity coverage, and that no portion of this liability can be allocated to Grace. Maryland contends that Grace has no coverage for losses due to Grace's knowing misconduct. Thus, Maryland maintains that it has no duty to indemnify Grace for expected injuries. Most liability insurance policies provide coverage only for bodily injury or property damage that the insured neither expects nor intends, Maryland says. In regard to the Maryland policies, this exclusion, set forth in special, hand-crafted endorsements, provides in more categorical terms, Maryland argues,

that coverage is afforded only for injuries "unexpectedly," "unintentionally" or "accidentally" caused.[9]

In particular, Maryland seeks summary judgment that it has no duty to indemnify for any liability imposed upon Grace in *City of Greenville v. W.R. Grace & Co.,* No. 85–1693–14 (D.S.C., complaint filed June 21, 1985). After a jury trial in that case, the court awarded $6.4 million in compensatory damages and $2 million in punitive damages against Grace. In *Greenville,* the court in an amended order, commented that Grace knew of the hazard of asbestos in buildings when it sold its asbestos products to the city. *City of Greenville v. W.R. Grace & Co.,* 640 F.Supp. 559, 566 (D.S.C.1986), *aff'd,* 827 F.2d 975 (4th Cir.1987), *reh'g denied,* 840 F.2d 219 (4th Cir.1988).

Grace argues that the pre–1967 policies contains no requirement that the property damage be accidental, unexpected or unintentional. Grace refers to that portion of the endorsement that defines "occurrence" to mean

either an accident in or a continuous or repeated exposure to conditions which result during the policy period in injury to or destruction of—

(A) Property including the loss of use thereof which is accidently (sic) caused and

(B) Tangible or physical property, including the loss of use thereof.

Exh. B, tab 5 to Maryland's Memorandum of Law in Support of Motion. Grace points out that sub-part B contains no "accidental" qualification for any claim involving "tangible or physical property" and that a building damaged by its product is tangible or physical property. Maryland disputes that the underlying claims concern "injury to or destruction of ... tangible or physical property." These claims, if coverage exists at all, says Maryland, would fall under sub-part A, which requires an accidentally caused loss of use. Grace notes, though,

9. An endorsement, for example, states "'Occurrence' means an event, or continuous or repeated exposure to conditions, which *unexpectedly* causes injury during the policy period."

Exh. B, tab 2 to Maryland's Memorandum in Support of Motion (filed under seal) (emphasis added).

that the very endorsements provide for the deletion from the insuring agreement of the words "caused by accident."

In any event, the endorsement also provides that "such insurance as is afforded by this endorsement does not apply to property damage caused *intentionally* by or at the direction of the insured." *Id.* at tab 5 (emphasis added). Thus, these policies do not provide coverage for intentional property damage.

Turning to the 1967 to 1973 policies, Grace acknowledges that they provide coverage when an occurrence "unintentionally causes injury to or destruction of property." *Id.* at tab 6. Nevertheless, Grace points to the "liberalization" clause in these policies, which provides that when the provisions of the later policies vary from the earlier policies, the insured has the option to have the earlier terms and conditions apply. Since the prior policies contain language providing coverage for unintentional property damage, the liberalization clause has no effect on this issue. Thus, the '67 to '73 policies, like the earlier ones, do not provide coverage for intentional property damage. Thus, Maryland is entitled to summary judgment declaring that it has no duty to indemnify Grace for liability for injuries that were not unintentionally caused.

▆▆▆ Even if the policies provide no coverage for intentional injury, Grace argues that Maryland ignores the distinction made by the courts between an intentional act and an intentional injury. *See City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1152 (2d Cir.1989). Maryland argues that even under *City of Johnstown*, losses arising from asbestos-related claims against Grace fall outside the coverage because they were not accidental, unexpected or unintended. The relevant issue, as Grace argues, is not whether the policyholder willfully committed the act, but whether the policyholder intended the resulting damage. *Id.* In other words:

It is not enough that an insured was warned that damages might ensue from its actions, or that, once warned, an insured decided to take a calculated risk and proceed as before. Recovery will be barred only if the insured intended the damages, or if it can be said that the damages were, in a broader sense, "intended" by the insured because the insured knew that the damages would flow directly and immediately from its intentional act.

*Id.* at 1150 (citations omitted).

Maryland has submitted evidence indicating that Grace knew of the dangers of asbestos as early as 1956. *See* Kerst declaration and documents filed thereunder under seal. For example, Maryland has submitted evidence that Grace was aware of the hazards of asbestos-containing products, and had developed an asbestos-free insulation product, yet continued to sell asbestos-containing Monokote until such sale was prohibited by EPA regulation in 1973. *See* letter from Maryland's counsel, Aug. 8, 1988 and exhibits filed under seal. Maryland has submitted a considerable amount of evidence on this issue. Grace disputes the existence of evidence showing that Grace believed, or that it was generally accepted, that asbestos products, once installed, caused property damage. Maryland, by its evidence, hopes to show that Grace intended the consequences of its actions. This evidence raises factual issues that bar summary judgment for Grace's claim that it is entitled to full and complete defense and indemnification on the triggered policies.

In regard to *Greenville*, though, the court did not consider whether Grace intended to cause the damage alleged in that case. Indeed, in *Dayton Independent School District v. National Gypsum Co.*, 682 F.Supp. 1403, 1408 n. 14 (E.D.Tex. 1988), *reversed on other grounds, sub. nom, W.R. Grace & Co., supra,* the court found that the *Greenville* decision only addressed whether the jury could have properly found that Grace's negligence warranted punitive damages, not whether Grace intended to cause property damage when it sold asbestos-containing materials. Thus, the *Greenville* jury did not find that Grace intended to cause property damage, the court added. *Id.* We agree with the

*Dayton* court's reading of *Greenville*, particularly in view of *City of Johnstown.*

Maryland argues that a distinction should be drawn between policies, like the present ones, that require injury or damage be "unexpectedly cause[d]" and the "expected or intended" language of other policies, which is more inclusive. *See Borg–Warner Corp. v. Liberty Mutual Ins. Co.,* No. 88–539 (Sup.N.Y., Tompkins Co. Jan. 24, 1991), slip op. at 34. Even though the policies in *City of Johnstown* contained the "expected or intended" language, the ruling there suggests that it would encompass the Maryland policy language. As the Second Circuit said:

> [T]o exclude all losses or damages which might in some way have been *expected* by the insured, could expand the field of the exclusion until virtually no recovery could be had on insurance. This is so since it is mishaps that are 'expected'— taken in its broadest sense—that are insured against.

877 F.2d at 1150 (emphasis in original).

Thus, Maryland's motion for summary judgment is denied concerning *Greenville.*

*Punitive Damages*

██ Maryland argues that it has no obligation to indemnify Grace for any judgments awarding punitive damages against Grace or for any sanctions, fines or penalties imposed against Grace. Citing *Public Serv. Mut. Ins. Co. v. Goldfarb,* 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1981), and *Hartford Accident & Indem. Co. v. Village of Hempstead,* 48 N.Y.2d 218, 422 N.Y.S.2d 47, 397 N.E.2d 737 (1979), Maryland notes that New York courts have long held that under no circumstance may an insurer indemnify an insured for punitive damages. These holdings are based on public policy reasons. *Village of Hempstead,* 422 N.Y.S.2d at 51–52, 397 N.E.2d at 741–42. Public policy aside, Maryland argues that its policy language limits coverage to bodily injury or property damages and punitive damages do not fall within either category.

In response, Grace contends that New York law does not control the issue of coverage for punitive damages. In the absence of any choice of law provision in the policies or other countervailing considerations, Grace says, the question of insurability is usually decided by reference to the law of the state that imposed the punitive damages—in regard to the state that imposed the punitive damages—in regard to the *Greenville* case, South Carolina. In South Carolina, Grace submits, Maryland's policies cover the punitive damage award in *Greenville. Carroway v. Johnson,* 245 S.C. 200, 139 S.E.2d 908, 910 (1965). But even in New York, Grace adds, coverage depends on the precise nature of the punitive damage award. Grace submits that an award based on non-intentional or vicarious liability would be covered in New York. *See Village of Hempstead, supra,* 422 N.Y.S.2d at 50, 397 N.E.2d at 740.

The New York Court of Appeals has now resolved the issue. In *Home Ins. Co. v. American Home Products Corp.,* 75 N.Y.2d 196, 551 N.Y.S.2d 481, 484, 550 N.E.2d 930, 933 (1990), that court applied its earlier holdings in *Goldfarb* and *Hartford* to out-of-state judgments. Thus, in New York, public policy prevents an insurer from reimbursing an insured for punitive damages awarded against the insured in an out-of-state judgment. The Court of Appeals also indicated that an award of punitive damages is not limited to intentional conduct but may involve wilful or wanton negligence or recklessness. 551 N.Y.S.2d at 485, 550 N.E.2d at 934.

Grace argues, however, that because of the similarity in the law of Illinois, the state of the underlying judgment, and New York, in *Home Insurance,* it was appropriate to apply New York policy to the Illinois judgment. Under Illinois law, punitive damages "may only be awarded upon a showing that a tort has been 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others * * *.' " *Home Insurance Co.,* 551 N.Y.S.2d at 485, 550 N.E.2d at 934 (citations omitted). In South Carolina, the state of the *Greenville* judgment,

on the other hand, says Grace, mere gross negligence justifies an award of punitive damages. *Kennedy v. Columbia Lumber & Mfg. Co., Inc.*, 299 S.C. 335, 384 S.E.2d 730, 737 (1989). Because punitive damages may be awarded in South Carolina for conduct less egregious than what would support a punitive award in New York, Grace contends, the reasoning of *Home Insurance Co.* does not apply to the award in *Greenville.*

Nevertheless, the Fourth Circuit in *Greenville* stated that under South Carolina law, "punitive damages may be recovered when a tortfeasor acts willfully, wantonly, or in reckless disregard of the rights of another." *City of Greenville*, 827 F.2d at 983. This language differs very little, if at all, from the language quoted above in *Home Insurance Co.* relating to Illinois law on punitive damages. But even if South Carolina has a less stringent test for an award of such damages, the conduct the jury found Grace guilty of fits within the confines of the "more stringent" Illinois law. *See id.* at 982.[10] In short, the conduct of Grace, as found in *City of Greenville*, would support an award of punitive damages in New York. *Home Insurance Co.*, 551 N.Y.S.2d at 486, 550 N.E.2d at 935. Accordingly, we find that New York public policy prevents Maryland from reimbursing Grace for its actions in *Greenville.* Maryland's motion for summary judgment on this issue is granted. The parties have not submitted any other evidence of awards of punitive damages against Grace, so summary judgment for such awards is premature.

<hr/>

**10.** The Fourth Circuit said:

We think that the jury reasonably could have concluded from this evidence that Grace knew of the risks associated with asbestos-containing Monokote when it sold the produce to Greenville, and that Grace failed to take reasonable steps to eliminate those risks. The evidence indicated that Grace knew both of the health risks resulting from exposure to asbestos and of the likelihood that the Monokote would release asbestos fibers into the Greenville City Hall because of its failure to bond properly.
827 F.2d at 982.

*Duty to Defend Upon Exhaustion of Limits*

■ Royal seeks a declaration that any defense obligation it may owe to Grace under its pre–1966 policies will terminate upon the exhaustion of those policies' limits.[11] Maryland joins in Royal's request. The defense provisions of the pre–1966 Royal policies sold to Zonolite, Grace's predecessor, provide:

As respects the insurance afforded by other terms of this policy the Company[Royal] shall:

(a) defend any suit against the Insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent;

\* \* \* \* \* \*

The amounts incurred under the insuring agreement, except settlements of claims and suits, are payable by the Company in addition to the applicable limit of liability of this policy.

Titus 8–21–87 Aff. Exh. 1–3 (Insuring Agreements, II Defense, Settlement, Supplementary Payments).

Royal cites *Commercial Union Ins. Co. v. Pittsburgh Corning Corp.*, 789 F.2d 214 (3d Cir.1986); *Keene Corp. v. Ins. Co. of N. Am.*, 597 F.Supp. 946 (D.D.C.1984), *vacated as a result of settlement*, 631 F.Supp. 34 (D.D.C.1985); and *Zurich Ins. Co. v. Northbrook Excess & Surplus Ins. Co.*, 145 Ill.App.3d 175, 98 Ill.Dec. 512, 494 N.E.2d 634 (1986), to support its position. Grace counters that since these cases apply Pennsylvania and Illinois law, not New

<hr/>

**11.** Grace concedes that the duty to defend ends when the policy limits are exhausted for post–1966 policies. As stated, *see, supra,* note 3, the insurance industry redrafted its standard CGL policy in 1966. The new language makes clear that the company has no obligation to defend after the liability limits have been exhausted. The 1966 defense obligation clause provides: "[T]he company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements." *See Federal Ins. Co. v. Cablevision Systems Dev. Co.*, 836 F.2d 54, 56 (2d Cir.1987).

York law,[12] the court should disregard them.

The only New York case that addresses the issue, *American Employers Ins. Co. v. Goble Aircraft Specialties, Inc.*, 205 Misc. 1066, 131 N.Y.S.2d 393, 400 (Sup.Ct., N.Y.Co.1954), *appeal withdrawn*, 1 A.D.2d 1008, 154 N.Y.S.2d 835 (1st Dep't 1956), holds that the duty to defend survives the exhaustion of the policy limits.[13] The court there found the language in the policy, "defend any suit against the insured," which also appears in our policies, unambiguous. *Id.* Though Royal argues that *Goble* represents an outdated and minority view, it appears to represent the law in New York.[14] It was cited in *Blasch v. Chrysler Motors Corp.*, 114 Misc.2d 223, 450 N.Y.S.2d 1012, 1016 (Sup.Ct. Albany Co.1982), *rev'd on other grounds*, 93 A.D.2d 934, 462 N.Y.S.2d 313 (3d Dep't 1983), for the proposition that the policy language must be examined to determine if the duty to defend terminates with the insurer's payment of the policy limits. Furthermore, the district court in *Federal Ins. Co. v. Cablevision Systems Dev. Co.*, 662 F.Supp. 1537, 1539–40 (E.D.N.Y.), *aff'd*, 836 F.2d 54 (2d Cir.1987), cited *Goble Aircraft*, and *Blasch* too, to show that the duty to defend is essentially limitless. Consequently, we find under New York law that the duty to defend survives the exhaustion of the policy limits and, hence, deny summary judgment to Royal on this issue.

*Limitation of Coverage to Sums Payable as Damages and Limitation of Coverage to Claims for Property Damage*

The insurers seek a declaration, with respect to the underlying asbestos-related building cases, that to the extent these suits do not seek damages, no coverage—defense or indemnification—is afforded under their policies. Typically, the policies provide for the defense of suits seeking damages and for indemnification of "sums which the Insured shall become legally obligated to pay *as damages* because of injury to or destruction of property, including the loss of use thereof." *See supra*, n. 3 (emphasis added). The insurers contend that the policies do not provide coverage for suits seeking relief other than damages, such as declaratory or equitable relief. The term "damages", say the insurers, explicitly qualifies both the duty to defend and the duty to indemnify.

Many suits, for example, seek injunctions requiring Grace to test for and remove asbestos-containing materials in school or other buildings. Others seek equitable restitution of costs claimants have incurred to test for and remove asbestos-containing material. And still others seek a declaration that Grace must indemnify the claimants for costs they incur in responding to potential future claims by persons who may be exposed to asbestos-containing materials present in the claimants' buildings.

Needless to say, Grace resists the entry of the requested declaratory judgment. It argues that all the complaints in the underlying case seek damages on account of property damage. But more than that, Grace maintains that damages means money the insured is legally obligated to pay for the results of property damage.

Another related issue concerns the limitation of coverage to claims for property damage. Maryland seeks a declaration that it has no duty to defend or indemnify for school cases that seek recovery for strictly monetary injuries, rather than property damage. This category includes

---

**12.** Royal notes that New York law governs the interpretation of its policies under which Grace seeks coverage.

**13.** Royal notes that *Goble Aircraft* involved a pre–1955 defense obligation clause. Nonetheless, we see no meaningful difference between that clause and the post–1955 clause. The 1966 clause, on the other hand, as noted, *see supra* note 11, makes clear that the defense obligation ceases upon the exhaustion of the indemnity limits.

**14.** At present, with regard to automobile insurance policies, New York law—11 N.Y.C.R.R. 60.1, par [b]—requires the insurer to defend after exhaustion of the policy limits. *See Delaney v. Vardine Paratransit, Inc.*, 132 Misc.2d 397, 504 N.Y.S.2d 70, 71 (Sup.Ct. Schenectady Co.1986); *Exchange Mutual Insurance Co. v. Geiser*, 130 Misc.2d 959, 498 N.Y.S.2d 291, 293 (Sup.Ct. Albany Co., 1986).

the expense of testing for potential health problems and upgrading school facilities to preclude future health hazards. These expenses are not incurred, Maryland maintains, because of "property damage."

Grace points out that the underlying complaints allege property damage due to the presence of asbestos-containing materials. Grace also notes that Maryland paid for inspections costs, replacement costs, etc. in the Bituthen and WRDA (construction chemical additive called "WRDA–99", had to do with installation of sub-par WRDA id at 16) claims. It points out, too, that Aetna paid claims for removal and replacement of formaldehyde foam insulation in homes. *Id.* at 21

Courts have reached different results on the term "as damages." The conflict focuses on whether the term is interpreted according to the legal or equitable nature of the liability or to the meaning of the term to the ordinary person. *American Motorist Ins. Co. v. Levelor Lorentzen, Inc.*, No. 88–1994, 1988 WL 112142 at *2 (D.N.J.1988), *appeal dismissed*, 879 F.2d 1165 (3d Cir.1989). The Second Circuit has concluded that New York would afford the term "damages" its ordinary meaning and, hence, remedial costs for the cleanup of a waste site constitute damages. *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1207 (2d Cir.1989), *reh'g. denied*, 894 F.2d 498 (2d Cir.) (per curiam), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). *Avondale* involved an oil recycling facility and a dump site in Louisiana. Persons residing near the dump site instituted actions for personal injury and property damage caused by pollutants from the site. *Id.* at 1201. In addition, the plaintiff there received a letter from the Louisiana State Attorney General's office, issued at the request of the Louisiana State Department of Environmental Quality (DEQ), indicating that DEQ intended to clean up the waste site at the

recycling facility and recover all remedial costs for the cleanup. *Id.* at 1202. The court imposed on the insurer the duty to defend the DEQ proceeding and the private actions, too.

■ On the damage issue the court said:

> In New York, the terms of an insurance policy have long been accorded "a natural and reasonable meaning," *Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439, 443, 154 N.Y.S.2d 10, 136 N.E.2d 484 (1956), corresponding to "the reasonable expectation and purpose of the ordinary businessman." *Ace Wire & Cable Co. v. Aetna Casualty & Sur. Co.*, 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 457 N.E.2d 761 (1983); see *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 51, 120 N.E. 86 (1918). If there is uncertainty concerning its meaning, a policy is construed to embrace coverage. *Insurance Co. of No. Am. v. Dayton Tool & Die Works Inc., v. Liberty Mut. Ins. Co.*, 57 N.Y.2d 489, 457 N.Y.S.2d 209, 443 N.E.2d 457 (1982); *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 361, 357 N.Y.S.2d 705, 314 N.E.2d 37 (1974); accord *National Grange [Mut. Ins. Co. v. Continental Casualty Ins. Co.]*, 650 F.Supp. [1404] at 1408 [ (S.D.N.Y.1986) ]. When an insurer that drafts the instrument wants to exclude from coverage policy obligations it would otherwise assume, it must do so in clear and unmistakable language. See *Seaboard [Sur. Co. v. Gillette Co.]*, 64 N.Y.2d [304] at 311 [486 N.Y.S.2d 873, 476 N.E.2d 272] [ (1984) ].

*Id.* at 1206–07. It noted the policy there did not include any definition of the term "damages". *Id.* at 1207. A number of other cases, the court added, have held that cleanup costs are damages under the same kind of policy.[15] *Id.* Although *Avondale* concerns cleanup costs of toxic waste materials, the two cases the insurers principally

---

**15.** The language of the provision in the CGL policy interpreted in *Avondale* is almost identical to the language of the Maryland–Grace policies. The *Avondale* policy provided that

> [Travelers] will pay on behalf of the insured all sums which the insured shall become le-

gally obligated to pay *as damages because of* bodily injury or *property damage* to which this policy applies caused by an occurrence. 887 F.2d at 1202 (emphasis added).

rely on, *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chemical Co. Inc.*, 842 F.2d 977 (8th Cir) (en banc), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (*NEPACCO* ), and *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988),[16] like *Avondale,* involve environmental cleanup costs. Not only that, the insurers argue that the rule they urge—that coverage is afforded only for sums the insured is legally obligated to pay as damages—applies with equal force to asbestos building cases. *See* Reply Memorandum of insurers at 6. Thus, under New York law, the insurers have a duty to defend the building cases, regardless of whether they contain claims for equitable relief or, for that matter, for compliance with orders of regulatory agencies.[17]

The law of the State of Washington, which, according to General governs its policies, provides that response costs incurred under CERCLA are damages within the meaning of CGL policies. *Boeing Co. v. Aetna Casualty & Sur. Co.*, 113 Wash.2d 869, 784 P.2d 507, 516 (1990). Response costs, as defined by CERCLA, include costs of removal of hazardous substances from the environment and the costs of other remedial work. *Id.* 784 P.2d at 509. *Boeing* also held that the "term 'damages' does not cover safety measures or other preventive costs taken in advance of any damage to property." *Id.* 784 P.2d at 516.

Under California law, which, Aetna says, governs its policies issued to California Zonolite, CERCLA cleanup costs are considered damages. *AIU Ins. Co. v. Superior Court (FMC Corp.),* 51 Cal.3d 807, 274 Cal.Rptr. 820, 842, 799 P.2d 1253, 1275 (1990); *Intel Corp. v. Hartford Accident & Indem. Co.*, 692 F.Supp. 1171, 1186–87 (N.D.Cal.1988); *Aerojet–General Corp. v. San Mateo Cy. Superior Court,* 211 Cal. App.3d 216, 257 Cal.Rptr. 621, 631, *reh'g. denied,* 211 Cal.App.3d 216, 258 Cal.Rptr. 684 (1989).[18]

The Supreme Court of Minnesota has also spoken on this issue. Minnesota law, according to Aetna, applies to the policies issued to Western Mineral. Responding to a certified question from the Federal district court there, the Minnesota Supreme Court found that the costs of complying with directives issued by state and federal environmental agencies to clean up groundwater contamination caused by pollution is covered under CGL policies. *Minnesota Mining & Manufacturing Co. v. Travelers Indemnity Co.,* 457 N.W.2d 175, 184 (Minn. 1990).

Grace notes that the underlying claimants do not seek damage for safety measures taken in advance of injury to property. Rather, these claimants, Grace adds, seek compensatory damages as a result of property damage that, they allege, has already occurred. If that is so, in the states mentioned above—New York, Washington, California and Minnesota—it appears that Grace would be entitled to coverage. Still, a determination must await examination of the underlying claims. Suffice it to say, the insurers' motion for summary judgment is denied.

On the question of coverage for claims for property damage, it appears New York would provide coverage. In *City of New*

16. The underlying suits in *NEPACCO* and *Armco* were brought by the government, pursuant to the Comprehensive Environmental Response and Compensation and Liability Act of 1980 (CERCLA) (Superfund).

17. In *American Motorist Insurance Co. v. Levelor Lorentzen, Inc.,* No. 88-1994, 1988 WL 112142 (D.N.J.1988), *appeal dismissed,* 879 F.2d 1165 (3d Cir.1989), the court found that New York's highest court would find that the term "as damages" would encompass the cost of statutorily mandated environmental cleanup costs. (CERCLA). 1988 WL 112142 at *4.

18. The *Aerojet* court, like the *Boeing* court, found that damages do not include costs to prevent future pollution. 257 Cal.Rptr. at 635. The California Supreme Court in *AIU Ins. Co.* noted that prophylactic costs—incurred to pay for measures taken in advance of any release of hazardous waste—are not incurred because of property damage. 274 Cal.Rptr. at 846, 799 P.2d at 1279. On the other hand, costs for compliance with injunctions that require remedial and mitigative action constitute damages. *Id.* 274 Cal.Rptr. at 845, 799 P.2d at 1278.

*York v. Keene Corp.*, No. 84–44559, slip op. at 7 (Sup.Ct. N.Y. Co. Nov. 19, 1985), *aff'd*, 129 A.D.2d 1019, 513 N.Y.S.2d 1004 (1st Dep't 1987), the court found that the refitting of the city's buildings, contaminated by asbestos, to make them safe to be the measure of plaintiffs' property damage. Slip op. at 7–8. Moreover, the Second Circuit has held, under New York law, that consequential or intangible damages— in particular, lost profits—are within the terms of the 1966 revised standard CGL policy insuring for property damage. *Aetna Cas. & Sur. Co. v. General Tire Corp.*, 704 F.2d 80, 83 (2d Cir.1983).

Other jurisdictions have reached different results. *Compare Mraz v. Canadian Universal Ins. Co. Ltd.*, 804 F.2d 1325, 1329 (4th Cir.1986) (CERCLA response costs do not constitute property damage) *with AIU Ins. Co.*, 799 P.2d at 1279 (reimbursement of response costs and the costs of injunctive relief under CERCLA and related statutes are incurred because of property damage). Maryland initially relied on the Illinois trial court decision in *United States Fidelity and Guaranty Co. v. Wilkin Insulation Co.*, No. 84–CH–11676 (Cir. Ct. Cook Co. Aug. 14, 1987), which held that claims arising out of the installation of asbestos-containing materials in schools and other public buildings were not claims for property damage. During the pendency of the instant motions, however, the Illinois Appellate Court reversed, holding that the incorporation of such materials in buildings constitutes property damage, which results in the diminution in value of the greater building structure. *United States Fidelity and Guaranty Co. v. Wilkin Insulation Co.*, 193 Ill.App.3d 1087, 140 Ill.Dec. 907, 550 N.E.2d 1032 (First District, Fourth Division 1989), appeal filed, 140 Ill.Dec. at 912, 550 N.E.2d at 1037. The court added that diminution in value was not property damage. *Id.* Rather, the incorporation of the defective product constituted property damage. *Id.* As a result, the court held that the insurers had a

duty to defend. As for a duty to indemnify, the court found a determination on that issue premature since the underlying complaints had not been adjudicated. *Id.* 140 Ill.Dec. at 916, 550 N.E.2d at 1041.

In any event, as noted, it appears under the law of New York, and California, Grace would be entitled to coverage. Thus, for those states, the insurers' motion for summary judgment on this issue is denied.

*Trigger of Coverage for Public Building and School Claims*

■ Next, the parties disagree about the trigger of coverage for property damage claims.[19] Grace argues for a continuous trigger theory or exposure theory. Under its view, all policies in effect from installation to removal or containment provide coverage. Maryland, on the other hand, urge a manifestation trigger. Property damage, to Maryland, occurs on the date of discovery or manifestation. To trigger coverage, under this theory, the discovery of damage must occur during the policy period. Some courts have adopted the continuous trigger, *see, e.g., Broderick Inv. Co. v. Hartford Accident & Indem. Co.*, 742 F.Supp. 571 (D.Colo.1989), relying on *Dayton Independent School District v. National Gypsum, supra*, 682 F.Supp. at 1410, *rev'd sub. nom., W.R. Grace & Co.*, 896 F.2d 865, 876 (finding that New York law squarely conflicts with the continuous trigger theory applied by the district court or at least is not settled); *New Castle County v. Continental Casualty Co.*, 725 F.Supp. 800, 813 (D.Del.), *motion for reconsideration denied*, 728 F.Supp. 324 (D.Del.1989); *Lac D'Amiante Du Quebec Ltee. v. American Home Assur. Co.*, 613 F.Supp. 1549, 1561 (D.N.J.1985), *vacated on other grounds*, 864 F.2d 1033 (3d Cir. 1988), and others have adopted the manifestation trigger. *See, e.g., Mraz v. Canadian Universal Ins. Co., Ltd.*, 804 F.2d 1325, 1328 (4th Cir.1986); *Pittsburgh Corning Corp. v. Travelers Indem. Co.*, No. 84–3985, slip op. at 4, 1988 WL 5296,

---

**19.** Royal takes no position on the trigger of coverage for property damage cases. Royal agrees to be bound by whatever trigger of coverage the court endorses.

Aetna argues against the continuous trigger. We do not address this issue in regard to Aetna until its policies have been proven.

1988 U.S.Dist. Lexis 634 (E.D.Pa. Jan. 28, 1988), *adhered to on reconsideration,* (E.D.Pa. March 15, 1988) ("While a 'continuous trigger' theory may be used in order to remedy physical injury or disease caused by asbestos in the past, injury to property does not occur until it is discovered and the market value of the property drops."); *United States Gypsum Co. v. Admiral Ins. Co.,* No. 83–L–53328 (Ill.Cir.Ct, Cook Co., Jan 7, 1991), slip op. at 6685) ("*U.S. Gypsum*") ("Property damage is an economic matter for the most part. Personal injury may take place, as medical evidence will support, well before actual detection. Property damage, as a practical matter, does not take place until the damage is known or recognized.")

Maryland cites a recent case from the Eleventh Circuit that applied New York law and rejected the exposure theory. *Young v. Insurance Co. of North America,* 870 F.2d 610, 611 (11th Cir.1989). In that case, Young, a builder, was sued by a purchaser of one of his homes as a result of a fire caused by the faulty installation of a gas grill during construction. Young asked the insurer to defend him in the suit, pursuant to his general contractor liability policy in force at the time of construction. The insurer refused because the coverage had expired before the fire.

Young argued that the term "occurrence" in the policy should be interpreted to include exposure of the property to a hazardous condition—the faulty gas grill—during the policy period. The court rejected Young's argument, noting that the definition of property damage in the policy stated that it covers injury occurring during the policy period. *Id.*[20] This case does not mean, however, that New York rejects the exposure theory on facts like ours. The *Young* court expressly excluded from its rationale cases involving exposure during the policy period to materials such as asbestos. In those cases, the court said, exposure to asbestos could be deemed an injury under the policy, even though the outward signs of that injury did not appear until after the policy had expired. *Id.* at 612. The court distinguished between asbestos cases where exposure results in injury that is not readily apparent and those cases where no injury occurs until a specific event, like the fire in *Young* caused by the faulty installation of the gas grill. *Id.* Thus, *Young* does not support Maryland's position. On the other hand, in excluding asbestos from its rationale, the court relied on *Keene,* which, as discussed, has been undermined by *Abex.* See supra at 1212–1213. Thus, *Young* does not help Grace either.

Nevertheless, though the Fifth Circuit in *W.R. Grace & Co.* observed that the law in New York may be unsettled on this question, it cited *American Motorist Ins. Co. v. Levelor Lorentzen, Inc.,* No. 88–1994, 1988 WL 112142 (D.N.J.1988), *appeal dismissed,* 879 F.2d 1165 (3d Cir.1989), which looking to New York law held that: "In the context of damage to property caused by contamination from hazardous waste the 'first discovery' principle is the most appropriate standard to apply ... Slip op. at 9–10." *W.R. Grace & Co.,* 896 F.2d at 876. *Levelor* recognized that no clear precedent exists under New York law for either the time of injury or the first discovery standard. *Levelor, supra,* 1988 WL 112142 *4. But given the long periods of time involved and the difficulty of measuring the exact time that damage to property from pollution might occur, the court applied the discovery trigger because it "provides more certainty for insurance carriers in determining potential liability."[21] *Id.* The diffi-

---

20. *Greenlee v. Sherman,* 142 A.D.2d 472, 536 N.Y.S.2d 877 (3d Dept.1989), cited by Maryland, and just like *Young,* held that an insurer need not provide coverage for injury sustained after the expiration of the policy period (a fire) as the result of a condition created during the policy period (the alleged negligent installation of a furnace that caused the fire). 536 N.Y.S.2d at 881.

21. The California Supreme Court also adopted this reasoning in *Prudential–LMI Comm. Ins. v. Superior Court of San Diego County,* 51 Cal.3d 674, 274 Cal.Rptr. 387, 400, 798 P.2d 1230, 1246 (1990) in a first-party damage case (no third-party liability claims). Quoting from *Home Ins. Co. v. Landmark Ins. Co.,* 205 Cal.App.3d 1388, 1395–96, 253 Cal.Rptr. 277 (1988), the court said: "the manifestation rule in the first party context 'promotes certainty in the insurance in-

culty in measuring the exact time that damage to property occurs in pollution cases applies as well to asbestos. Consequently, we see no reason to depart from the reasoning in *Levelor*.

If we had any doubt about following *Levelor*, we take heart from the recent rejection of some of the authority cited by Grace.[22] Accordingly, we find that New York would adopt the discovery trigger for property damage claims. Thus, Maryland's motion for summary judgment, which seeks a declaration that it has no duty to defend or indemnify Grace for school asbestos cases in which the damage was discovered after the policy periods, is granted.

*Exclusion for Insured's Own Product*

 Maryland seeks summary judgment declaring that it has not duty to indemnify or defend Grace for liability for school asbestos cases to recover for damage to Grace's products. This dispute concerns the "own product" exclusion. As its name implies, this exclusion bars coverage for property damage to Grace's own products.[23] "The exclusion is premised on the understanding that liability policies are not intended to provide coverage for faulty workmanship, but rather for damage which an insured's product visits upon other property." *Carey Canada, Inc. v. Aetna Casualty & Surety Co.*, No. 84–3113, slip op. at 29 (D.D.C. March 31, 1988). These policies do not operate as performance bonds. *Parkset Plumbing & Heating Corp. v. Reliance Ins. Co.*, 87 A.D.2d 646, 448 N.Y.S.2d 739, 740 (2d Dep't 1982); *Carey Canada*, slip op. at 29. Nor are they a

warranty for the insured's products. The policies, however, provide coverage when an insured's product damages property owned by a third party. *Carey Canada*, slip op. at 29.

Maryland argues that the costs of removing and replacing Grace's products are not covered by Maryland's policies. Maryland also challenges Grace's contention that the own products exclusion does not apply when the product is incorporated into a larger entity.

*Carpole's Inc. v. Insurance Co. of North America*, 544 F.Supp. 6, 7 (D.Minn. 1982), upon which Maryland relies, does not resolve the dispute. In *Carpole's*, a declaratory judgment action, where the underlying suit involved the sale of fertilizer in defective and leaking containers to a customer of Carpole's, the court found that the loss of fertilizer and clean-up and removal costs fell under the exclusion. Maryland focuses on the finding that removal of the defective product came under the exclusion. In that case, however, the defective product had not been incorporated into a larger entity. Also, *Carpole's* concerned damage to the policyholder's product.

Maryland cites *Advanced Refrigeration & Appliance Co. v. Insurance Co. of North America*, 42 A.D.2d 484, 349 N.Y.S.2d 195 (3d Dep't 1973) and *Zandri Construction Co., Inc. v. Fireman's Ins. Co.*, 81 A.D.2d 106, 440 N.Y.S.2d 353 (3d Dept), *aff'd*, 54 N.Y.2d 999, 446 N.Y.S.2d 45, 430 N.E.2d 922 (1981), to show that

---

dustry and allows insurers to gauge premiums with greater accuracy ...'" *Id.*

**22.** For instance, the Fifth Circuit has reversed the district court in *W.R. Grace & Co.*, 896 F.2d at 877. In *California Consolidated Proceedings (Phase V–A)*, slip op. at 24, the court withdrew its initial adoption of the continuous trigger for property damage. *Asbestos Insurance Coverage Cases*, No. 1072 (Cal.Super.Ct. Jan. 24, 1990) (Statement of Decision Concerning Phase V–A Issues), slip op. at 15–16 ("Because property damage from ACBM [asbestos-containing building material] is not always continuous, the Court cannot adopt a comprehensive 'continuous trigger' approach as to which policies owe a duty to defend in the building cases." Further, in *Lac D'Amiante Du Quebec.*, though the Third

Circuit vacated the district court's opinion, relied on by Grace, on abstention grounds, it observed that "the risk is not insubstantial" that the New York courts would adopt a different test concerning the continuous trigger theory given the conflict of authority on the issue and its difficulty. 864 F.2d at 1046.

**23.** Specifically, the exclusion provides that the policies do not apply:

to injury to or destruction of (1) property owned by the insured, (2) any goods, products or containers thereof manufactured, sold, handled or distributed, or premises alienated by the named insured, or work completed by or for the named insured, out of which the accident arises.

Keating affidavit ¶ 10.

New York applies the own product exclusion and, thus, precludes recovery for damage to the insured's own product. In those cases, as in *Carpole's*, the plaintiffs sought coverage for defects in their own products or, more particularly, for defects in their own workmanship.

Thus, in *Advanced Refrigeration*, the plaintiff installed a refrigeration system at a resort hotel that allegedly failed to function. In *Zandri*, the plaintiff, a general contractor, erected a church and two years later was sued by the owners of the church for defective work product. The church claimed that Zandri failed to construct the building according to the plans and specifications, to use materials set forth in those plans and to perform labor in a workmanlike manner, thus rendering the building unsafe. 440 N.Y.S.2d at 354. In the present case, by contrast, the underlying claimants are not suing for defects in Grace's own products. They do not contend that Grace's products fail to provide fireproofing or soundproofing. *See Dayton*, 682 F.Supp. at 1412. They seek damages for injury to their buildings because of the presence of asbestos. *See id.* Their claims allege damage to other property into which Grace's products have been incorporated. The own products exclusion does not apply to such claims. *Carey Canada*, slip op. at 31; *see also U.S. Gypsum*, slip op. at 6723.

In sum, the exclusion does not apply where Grace's products are alleged to have caused damage to property owned by others. *Carey Canada*, slip op. at 31. On the other hand, the exclusion would apply if the underlying claimants allege that Grace supplied defective or faulty asbestos. *Id.* It appears that the underlying cases would allege that Grace's products caused damage to the property of others. But since the resolution of this issue depends of the facts of the underlying cases, *id.* at 27, summary judgment is inappropriate.

*Sistership*

The next dispute, between Grace and Aetna, concerns the "sistership" exclusion.[24] Aetna argues that this provision is potentially applicable to asbestos building cases and raises material issues of fact. Neither side has set forth any factual allegations concerning the sistership provision, so summary judgment may be inappropriate. Nevertheless, the arguments submitted by the parties and the limited factual presentation suggests that this provision does not bar coverage. "The provision is intended to exclude from coverage the cost of preventative or curative action by withdrawal of a product in situations in which a danger is to be apprehended." *Todd Shipyard Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 419 (5th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982). On the other hand, the provision does not exclude coverage for "damages caused by the very product whose failure to perform properly aroused apprehension about the quality of 'sister' products." *Id.* To the extent, then, that the underlying claims allege damage to property other than to Grace's products, the exclusion does not preclude coverage. *Carey Canada*, slip op. at 31–32. In addition, the exclusion does not apply because it appears that Grace did not withdraw its product. *Id.* at 32; *Wilkin*, 140 Ill.Dec. at 914, 550 N.E.2d at 1039; *U.S. Gypsum*, slip op. at 6722–23. If, on the other hand, Grace did withdraw its product, in those instances the exclusion may apply. In any event, as with the own products exclusion, summary judgment is not appropriate.

The foregoing considerations apply to the business risk exclusion.[25] The parties

---

**24.** The sistership exclusion provides:

This exclusion bars coverage for damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the insured's products or work completed by or for the insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected deficiency therein.

Aetna's Response Memorandum at 50, n. 58.

**25.** This provision excludes:

[P]roperty damage resulting from the failure of the named insured's products ... to perform the function or serve the purpose intended by the named insured, if such failure is due to a mistake or deficiency in any design,

have made no factual record yet it appears that this exclusion, too, does not bar coverage. This exclusion seems similar to the own products exclusion. As mentioned before in connection with that exclusion, the underlying claimants presumably have not alleged that Grace's products failed to perform their intended function. But because of the absence of factual record, summary judgment, again, is not appropriate.

*Special Limits Provisions in Maryland's Policies*

■■■ The next dispute concerns the special limits provisions in Maryland's policies issued between 1962 or 1963 and 1973. Although Maryland denies that most of the school cases involved insured property damage, should the court find otherwise, Maryland seeks to limit its liability by the special dollar limits in the Maryland–Grace policies. The special limit endorsement provides:

> The company's limits of liability for injury to or destruction of property arising from gradual pollution or the continuous discharge, leakage or overflow of smoke, fumes, waste or other materials, shall be:—
>
> $25,000. each occurrence
> $25,000. aggregate.

Exh. B to affidavit of Thomas J. Bell, Jr., sworn to January 5, 1990.[26]

Maryland notes that its policies with Grace from 1962 to 1973 provide for a total limit of $725,000 for suits falling within the special limits provision. Maryland paid $725,000 pursuant to the special limit provision in *Water Supply District of Acton v. W.R. Grace & Co.*, Civil Action No. 81–710–G (D.Mass.). In *Water Supply*, a third-party suit filed against Grace, the plaintiff sought recovery from Grace for injuries arising from the continuous discharge of material from a Grace chemical plant in Acton, Massachusetts. Without admitting that any coverage exists under its policies for the *Acton* suit, Maryland argues that its December, 1989 payment of $725,000 plus interest to Grace exhausted the special limits in all policies from 1962 to 1973. Thus, Maryland seeks summary judgment on this issue.

The special limit endorsement, negotiated by the parties, is unique to the Maryland–Grace policies and no case has interpreted it. For that reason, Maryland objects to Grace's use of the term "pollution exclusion clause" to describe the special limits endorsement. Nonetheless, Grace, responding to Maryland's argument, cites cases that interpret the common "pollution" exclusion provisions contained in standard CGL policies.[27] *See, e.g., Grinnel Mut. Reinsurance Co. v. Wasmuth,* 432 N.W.2d 495, 497–500 (Minn.Ct.App.1988) (pollution exclusion does not apply to damage caused by formaldehyde foam insulation); *Wilkin,* 140 Ill.Dec. at 913, 550 N.E.2d at 1038 (relying on *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.,* 180 Ill.App.3d 378, 129 Ill. Dec. 306, 535 N.E.2d 1071 (1989), which found the exclusion clause ambiguous, construed it against insurers and also found exclusion applicable to active polluting conduct or where polluting was expected and intended, held that given lack of evidence that insured's conduct was either expected or intended, exclusion no bar to coverage); *National Grange Mut. Ins. Co. v. Continental Cas. Ins. Co.,* 650 F.Supp. 1404,

---

formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to ... property damage resulting from the active malfunctioning of such products ...
Aetna's Brief at 51 n. 60.

**26.** The 1961–62 policy excluded liability for the injury described in the text. The manuscript policy in effect between 1967 and 1973 limited liability to $100,000 for each occurrence and in the aggregate.

**27.** The usual pollution exclusion clause provides:

> This insurance does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

1410–11 (S.D.N.Y.1986) (Weinfeld, J.), (usual pollution exclusion applies to damage caused intentionally).[28]

Maryland points out that throughout this litigation, Grace has asserted that the school cases involve property within the meaning of the Maryland–Grace policies. Grace has also argued, says Maryland, that the school asbestos cases involve a "continuous" occurrence. Thus, Maryland submits, these cases come under the "continuous discharge" aspect of the gradual pollution clause. Maryland adds that the usual pollution exclusion clause permits coverage for sudden and accidental pollution as opposed to gradual pollution or continuous discharge of other material such as asbestos. Finally, Maryland urges that the plain meaning of the exclusion controls. To Maryland, the clause broadly encompasses the discharge of "other material" besides those illustrative substances (smoke, fumes and waste) listed and clearly applies to asbestos fibers.

Grace argues that the underlying cases are product-liability cases and, thus, do not allege industrial pollution. Grace also submits the affidavit of an officer of the insurance broker who assisted in the negotiations for the policies, who says that special limit endorsement was intended to apply only to certain claims concerning industrial pollution, and not to claims such as the underlying asbestos-related claims. Affidavit of Thomas Keating at ¶ 9.

The affidavit of Thomas Keating does not create a factual issue. Even though, as Grace notes, the affidavit remains uncontested, it is too conclusory and thus insufficient under Rule 56(e). *See Industrial Risk Insurers v. Creole Production Servs., Inc.,* 568 F.Supp. 1323, 1325

(D.Alaska 1983), *aff'd,* 746 F.2d 526 (9th Cir.1984).

Nevertheless, the special limits clause does not, as Maryland urges, broadly encompass asbestos under the term "other materials." We find the language of the provision ambiguous at least with regard to asbestos. It is true, as Maryland argues, that the provision differs from the general pollution exclusion clause in that it applies to gradual pollution and continuous discharge. And, of course, the special limits clause contains no "sudden" and "accidental" language. Yet nothing in the provision suggests that asbestos falls within its terms. One would not usually associate asbestos with the substances listed in the exclusion, namely, smoke, fumes or waste. *See Outer Cole,* at 2. Those substances bear a closer relation to industrial pollution, the usual subject of the ordinary pollution exclusion. *See, e.g., Grinnell,* 432 N.W.2d at 498. Even application of the doctrine of *ejusdem generis* suggests that asbestos does not come within the clause's intent. Recently, a trial court in Illinois held the usual exclusion inapplicable to asbestos because the product was "alleged to have caused contamination in a building as opposed to environmental contamination." *U.S. Gypsum, supra,* slip op. at 6729. The *U.S. Gypsum* court also said that "asbestos contamination of a building is not pollution as that word is commonly understood." *Id.* at 6730. Whatever the applicability of the usual pollution clause, we cannot find, as a matter of law, that the special limits provision applies to asbestos. Accordingly, Maryland's motion for summary judgment on this issue is denied.

*Proof of Existence of Terms of Policies*

Maryland seeks summary judgment declaring it has no duty to indemnify or de-

---

**28.** The parties also cite more recent cases interpreting the usual pollution exclusion in connection with asbestos. Maryland cites *Great Northern Ins. Co. v. Benjamin Franklin Federal Savings and Loan Association,* 793 F.Supp. 259 (D.Or.1990), which held the pollution exclusion clause excluded solid irritants and found asbestos a solid irritant. 793 F.Supp. at 263; *see also Hanawalt v. Belle City Heating & Sheet Metal, Inc.,* No. 88–Civ–2317 (Wis.Cir. Ct, Recibe County, Feb. 19, 1990).

Grace relies on *Outer Cole v. Celotex Corp.,* No. 87–6170 (14th Judicial Dist., La. Feb. 15, 1990), which found "the release of asbestos particles into the air during the installation, handling, and removal of insulation products was not an act of pollution within the contemplation of the average person." Mealey's Litigation Reports (March 13, 1990) at 2.

fend Grace for periods as to which the existence and terms of Maryland–Grace policies have not been proven by clear and convincing evidence. The other insurers seek similar relief. In regard to Aetna, as indicated, neither side has produced any of that company's policies. Grace contends that it has substantial secondary evidence that Aetna sold CGL insurance in the 1950's and 1960's to three companies subsequently acquired by Grace. See Posner June 1, 1987 affidavit ¶¶ 9–10. That evidence will be explored at a hearing to determine the existence and terms of Aetna's policies. Thus, Grace has not moved for summary judgment against Aetna, nor have any of the insurers. Maryland, though, has moved for apportionment of defense costs between all the carriers, including Aetna, to the extent Grace is able to establish that Aetna afforded responsive coverage. Aetna appears on a contingent basis—contingent upon proof of its policies. Its participation does not amount to a concession that it issued coverage to any of Grace's predecessors.

Grace has the burden of establishing the existence of coverage under New York law. *Abex,* 790 F.2d at 129–30 (citing *Emmons Indus., Inc. v. Liberty Mut. Fire Ins. Co.,* 545 F.Supp. 185, 188 (S.D.N.Y. 1982)). Maryland acknowledges that it issued policies to Grace for the years 1961–63. But for those policies, Maryland says, Grace has failed to establish their terms and conditions. As for pre–1961 policies, Maryland contends that Grace has failed to prove their existence.

With respect to the policies from 1963 to 1973, Grace has produced the policies. Indeed, Maryland notes that Grace has produced certain policy pages that been lost or missing from Maryland's files. Nevertheless, Maryland says it is unable to state that Grace has produced every provision of the policies since Maryland does not have copies of the policies. Grace has done all that it could to show the existence of these policies. It has satisfied its burden. The burden now shifts to Maryland to show that less than full policies were produced, a burden it has not meet. Thus, for the purposes of this litigation only, we find that Grace has made the required showing for the 1963–73 policies.

Of the 1963–73 policies, the 1967–70 policy requires further comment. For that policy, Maryland points out that neither party has produced a signed declarations page. The declarations page, however, unlike other declaration pages, contains no signature line. See Exh. A to the letter of Grace's counsel, dated 12–20–90. Nor, as Grace argues, does the page give any indication that a signature is necessary or expected.

Grace has also submitted the affidavit of Jeffrey Posner, its Assistant Claims Manager, who has responsibility for insurance coverage concerning the asbestos-related bodily injury and property damage claims pending against Grace. He asserts that Grace expended substantial premiums to purchase CGL policies from Maryland, including, among others, the 1967–70 policy. *See* Posner 6–1–87 affidavit at ¶ 2. In addition, Grace submitted the affidavit of the broker for the Maryland–Grace policies. He describes the terms of the 1967–70 policy, among others. *See* Keating 8–31–89 affidavit at ¶ 3. Thus, Grace had made a sufficient showing for summary judgment on the existence of the 1967–70 policy.

In regard to the other insurers, it appears Royal has conceded the existence of three policies, and General concedes four. But others have not been proven. A hearing will be held on the policies that Grace has not proven on this motion.

### Coverage for Subsequent Acquisitions

Maryland argues that its policies in force before Grace's acquisition of, or merger with, asbestos-manufacturing companies do not provide coverage for any asbestos-related suit against Grace. Prior to April, 1963, Grace had no asbestos-related activities. Maryland seeks summary judgment declaring if has no duty to defend or indemnify Grace under pre–1963 policies.

In 1963, Grace started acquiring asbes-

tos-manufacturing companies.[29] Maryland provided coverage to Grace before 1963, but maintains that its coverage cannot apply to liability arising from asbestos-related products at that time because of Grace's lack of involvement with such products. Maryland notes it did not insure asbestos-related activities. Liability insurance, Maryland submits, covers only the business specified in the policy and does not cover a subsequently acquired, distinct and separate business. To provide such coverage, Maryland says, would amount to a windfall of coverage for which no premium could possibly have been charged. As an example of the windfall, Maryland submits that accepting Grace's argument would mean that Grace could acquire the Johns–Manville Corporation and if claimants sued Grace as the successor of Johns–Manville, the bankrupt Manville Trust would again be funded through Maryland's policies. Maryland adds that Grace prior to 1963 could have no liability for asbestos related activities because it had no such activities. Thus, Grace at that time had no insurable interest in the later acquired companies, says Maryland.

Grace counters that the policy language means that Grace is covered for liability it incurs because of an injury during the policy period, regardless of who owned or produced the instrumentality of that injury. The acquisition of the company that manufactured asbestos, to Grace, is not the event that triggers coverage. Coverage is triggered, Grace adds, by the alleged continuous injury or property damage process upon which its liability is based. Grace does not dispute that it has no liability for pre–1963 asbestos activities. Nonetheless, if it is sued for such activities, rightly or wrongly, it claims Maryland owes it a defense at least. Grace also points to an endorsement to the Maryland policy that provides:

> In consideration of an additional premium to be determined, it is agreed that such insurance as is afforded by the policy shall apply to the name insured and any newly formed or newly acquired subsidiaries, divisions and companies coming under the control and active management of W.R. Grace & Co.

Keating Aff. ¶ 12. As a result of this endorsement, Grace submits that the pre–1963 policies apply to liabilities arising out of the subsequent acquisition by Grace of the Zonolite entities.

The endorsement, however, by its term, does not provide automatic coverage. It applies only if additional premiums are paid. For pre–1963 policies, Grace has not presented any evidence, as Maryland argues, that the amount of the additional premium for expanded coverage was ever determined, much less paid.

Nevertheless, Grace is not seeking coverage for claims against its acquired companies. Grace seeks coverage for claims against it directly. Grace asserts that the underlying claimants seek to hold it liable for pre-acquisition injury. The claimants make allegations of damage, says Grace, during the pre–1963 policy period. In effect, however, Grace seeks coverage for its acquisitions. As indicated, Grace had no involvement with asbestos before 1963. Its status as a defendant in the relevant underlying cases necessarily arises from its acquired companies. Maryland did not insure Grace for the pre-acquisition activities of those companies. *See State of Idaho v.*

---

**29.** The companies that Grace merged with or acquired include Zonolite, California Zonolite, Vermiculite–Northwest, Western Mineral, Texas Vermiculite Company, Ari–Zonolite and Tennessee Zonolite Company. The mergers and acquisitions took place over a several year period. Maryland notes that only after consummating the various acquisition and merger agreements did Grace seek coverage from Maryland for the newly acquired companies and in some cases Grace apparently waited until several years after the acquisition or merger to arrange for coverage.

The earliest acquisition, of Zonolite, took place in 1963. Maryland says that documentary evidence, *see* Agreement and Plan of Reorganization Between W.R. Grace & Co. and Zonolite Company, Section 3(ii)(a) (January 17, 1963) (Exh. C, Tab 2 to Maryland's Memo in Support), suggests that Grace intended to rely on Zonolite's existing coverage to respond to potential claims. Grace, however, points to an endorsement to Maryland's 1963 policy adding Zonolite to the "named insured" endorsement.

*Bunker Hill Co.*, 647 F.Supp. 1064, 1077–78 (D.Idaho 1986). In *Bunker Hill*, the liability coverage of an insured, Gulf, lapsed three weeks prior to its merger with Bunker Hill in which Bunker Hill became the wholly-owned subsidiary of Gulf. *Id.* at 1077. The court rejected Gulf's argument that the insurer assumed the liabilities of Bunker Hill before the merger. *Id.* Even though the plaintiff sought relief from Gulf for the time period when the policies were in effect, the court found that the plaintiff's claim had no arguable basis against Gulf and, thus, dismissed the action against the insurer. *Id.* In the present case, as in *Bunker Hill*, the underlying claimants seek relief from Grace for the time period when the Maryland policies were in effect, but before the merger. Grace had no relationship with the claimants before the merger. *See id.* Any injury to a claimant occurred before Maryland came on the risk. Consequently, Maryland has no duty to defend or indemnify.

Another case relied on by Maryland supports its position, even though, as Grace notes, the decision in that case consists only of a three page summary order. *See International Minerals & Chemical Co. v. Liberty Mutual Ins. Co.*, No. 84 L 50979 (Ill.Cir.Ct., Cook Co., Mar. 7, 1985). In that case, the court dismissed claims against insurers, each of which issued policies to the insured that expired before the insured acquired the facility that was the subject of the underlying lawsuit.

Lastly, the difficulty of this issue is multiplied by Grace's argument for a continuous trigger for both bodily injury and property damage cases. Since we have rejected the continuous trigger theory, part of Grace's position is open to question.

Accordingly, Maryland's motion for summary judgment is granted on this issue. On the other hand, if Grace can show that the claimants seek relief for Grace's own activities, Maryland would owe it a defense and provided Grace can show proof of coverage.

In regard to coverage after 1963, Maryland argues that Grace has failed to carry its burden of showing when coverage was obtained for each asbestos-related acquisition and therefore cannot be granted summary judgment. Maryland does not seek summary judgment on this issue. When Grace acquired the Zonolite Company in 1963, an endorsement inserted the "Zonolite Division" as an additional insured in the Maryland policies. Other companies acquired by Grace were added to these policies as insureds after 1963. *See* Exh. B to August 8, 1988 letter from Maryland's counsel. However, even after Grace acquired the asbestos companies, Maryland notes, Grace waited years in some cases to change the coverage for an acquired company from the previous carrier to Maryland. Maryland submits that Grace has the burden of showing when each of the acquired companies was brought under Maryland's policy coverage.

Grace argues that it has satisfied that burden. It has submitted copies of dated endorsements or declarations indicating coverage. *See, e.g.,* exhibits to letter of Grace's counsel, dated Jan. 25, 1991. Maryland responds that the presence of conflicting evidence as to the dates of these endorsements prevents summary judgment. In addition, because of recent submissions by Grace, Maryland has submitted an affidavit, pursuant to Rule 56(f), indicating its need to gather and present evidence regarding the dates and percentages of interests acquired by Grace in Zonolite and the other companies.

Grace has submitted copies of documents attempting to show dates of coverage: an endorsement adding the Zonolite Company as a "named insured" for the policy period 6–30–62 to 6–30–63; a declaration on a CGL Schedule listing Texas Vermiculite Co. effective 1–22–66; a declaration on a CGL Schedule for Vermiculite Northwest with a date of 9–15–66; a declaration on a CGL Schedule for California Zonolite, effective 9–14–66, a declaration on a CGL Schedule for Western Mineral with a date of 12–29–66, a schedule for Ari–Zonolite, effective from 6–30–69 to 6–30–70. *See* exhibits to letter of Grace's counsel, dated January 25, 1991.

██ Maryland questions the authenticity of these documents. It asserts that these documents were produced by Grace. Maryland also contends that it has produced evidence that contradicts these documents. The evidence that Maryland has submitted, though, does not appear to contradict Grace's documents. For example, Maryland has produced evidence that shows that Grace canceled its coverage with Aetna for Ari–Zonolite on January 1, 1970. *See* Exh. C, tabs 6, 7 to Maryland's Memo in Support of Motion. Maryland points to the declaration, produced by Grace, which shows that Maryland provided coverage for Ari–Zonolite from June 30, 1969. One explanation for this inconsistency is that Grace could have opted for additional coverage during the six months between June 30, 1969 to July 1, 1970. More than that, a memo, Maryland submits, reflecting the addition of Texas Vermiculite, effective January 1, 1966, to the Maryland policy, *see* exhibits to Maryland's counsel's letter, dated August 31, 1988, supports, rather than contradicts, the schedule concerning Texas Vermiculite as to the effective date of coverage. Nevertheless, it appears that the documents that Grace offers to show dates of coverage for its acquired companies, have not been authenticated. Rule 56(e) requires that the evidence considered on a summary judgment motion be admissible evidence. Under the circumstances, these documents cannot form the basis for summary judgment. Accordingly, Grace's motion for summary judgment is denied.

*Policies issued to predecessors* (Identity of the insured)

██ We turn to yet another area of dispute—the extent to which the insurers have a duty to defend and indemnify Grace in the underlying suits against Grace with respect to policies the insurers issued to Grace's predecessor companies. This issue concerns Royal, Aetna and General, all of whom have moved for summary judgment declaring that they have no duty to defend Grace. In brief, these insurers argue that Grace must show that their policy holder's products are implicated in the underlying actions. Grace contends it has satisfied its burden by showing that these actions were brought in the geographic areas where the products of the predecessor companies were distributed.

The cases the parties cite indicate that a surviving corporation, after a merger, by operation of the state merger statute, is vested with the rights and benefits belonging to any of the merged corporations. *See Chatham Corp. v. Argonaut Ins. Co.,* 70 Misc.2d 1028, 334 N.Y.S.2d 959, 961 (Sup. Nassau Co.1972); *Imperial Enterprises, Inc. v. Firemen's Fund,* 535 F.2d 287, 291 (5th Cir.), *reh'g denied,* 540 F.2d 1085 (5th Cir.1976); *Brunswick Corp. v. St. Paul Fire & Marine Ins. Corp.,* 509 F.Supp. 750, 753 (E.D.Pa.1981); *Paxton & Vierling Steel Co. v. Great American Ins. Co.,* 497 F.Supp. 573, 578 (D.Neb.1980). "In other words, the surviving corporation simply stands in the same position as that occupied by the merged corporation prior to the merger." *Brunswick,* 509 F.Supp. at 753.

Thus, in *Chatham,* the court held that an insurer had a duty to defend a corporation that merged with an insured even if the insured was not named in the underlying complaint. 334 N.Y.S.2d at 961. There, a Mrs. Gerdes sued the manufacturer of a ladder for injury she sustained as a result of the collapse of the ladder. The manufacturer impleaded Chatham claiming that Chatham supplied a defective component of the ladder. Chatham sought a defense and indemnification from the defendant insurance company that issued coverage to the Duraluminum Ladder Mfg. Co., which, after the injury, merged with Chatham. The manufacturer did not name Duraluminum in the third-party suit.

Nonetheless, the court said that "any right lawfully belonging to any of the constituent corporations merged together can be asserted by the surviving corporation." 334 N.Y.S.2d at 961 (citation omitted). The court also noted that the obligation to defend is determined from the allegations of the complaint.[30] *Id.* Although Duralumi-

---

**30.** General notes that under Washington law, the duty to defend arises from the allegations of

num was not named in the pleadings, the bill of particulars claimed that the alleged defective parts were purchased from that company and sufficiently identified it so as to compel the defendant insurance company to defend Chatham. The court declined to direct indemnification, however, because whether Duraluminum supplied the parts or whether they were defective could not be determined in advance of trial. *Id.* at 962.

The other cases, like *Chatham,* found that upon merger, the predecessor's contractual rights vested in the surviving corporation by operation of the applicable state merger statutes.[31]

In these cases, though, only one underlying suit was involved and the identity of the offending instrumentality, whether a ladder as in *Chatham,* or a filter as in *Brunswick,* was easily traceable to the predecessor company. By contrast, the instant case involves thousands of underlying cases and Grace's exposure arises from the manufacture and sale of asbestos-containing products of one or more of the companies Grace acquired. To make matters worse, the underlying cases do not name the asbestos-containing products that allegedly caused personal injury or property damage. These cases usually name many asbestos manufacturers and do not specify the time of exposure to the particular manufacturers' product. Thus, the parties do not know whether Grace is sued in its own right as the manufacturer or distributor of the asbestos products, as the successor to liabilities arising from products manufactured and distributed by Zonolite prior to its merger into Grace or as the successor to liabilities arising from products manufactured and distributed by

a Zonolite licensee prior to its acquisition by Grace.

Grace notes, however, that review of the dates and place of exposure and installation alleged suggests that these cases arise out of products sold by Zonolite and its licensees. As indicated, Grace entered the asbestos business in 1963 when it acquired the Zonolite Company by merger.[32] Grace claims that Zonolite sold asbestos products, either directly or indirectly, throughout the country. Grace also alleges that Royal insured Zonolite from at least 1950 through 1963 and, thus, Royal has a duty to defend Grace in any case involving pre–1963 injury or property damage. Royal did not insure California Zonolite, Ari–Zonolite, Western Mineral or Vermiculite Northwest.

The insurers argue that they have no duty to defend until Grace proves the involvement of their policyholders' products in the underlying cases. Grace, on the other hand, calls that burden unreasonable because one of its principal defenses is that neither its products, nor those of its acquired companies, are involved. Citing *Chatham,* 334 N.Y.S.2d at 961, Grace argues that the insurers have a duty to defend as long as it "can be ascertained" that the acquired company's acts or products may be at issue. The acquired companies' acts or products can be ascertained, according to Grace, because the underlying cases were brought in jurisdictions serviced by these companies. All these cases that allege pre–1963 exposure anywhere in the country must arise out of the activities of Zonolite, Grace adds, and should be covered by Royal. As for the Zonolite licensees, Grace contends, their products, marketed in certain geographic areas, are implicated in those cases alleging exposure in those areas. Thus, in the areas serviced by Cali-

---

the complaint. *See Berkeley v. Fireman's Fund Ins. Co.,* 407 F.Supp. 960, 965 (W.D.Wash.1975).

**31.** New York's merger statute, Business Corporation Law § 906(b)(2) (McKinney 1986), provides that upon merger, "[a]ll the property, real and personal, including subscriptions to shares, *causes of action and every other asset of each of* the constituent corporations, shall vest in such surviving or consolidated corporation without further act or deed."

**32.** Zonolite manufactured and distributed asbestos products, generally in the eastern United States. In other parts of the country, Zonolite had licensing agreements with General's and Aetna's policyholders, Vermiculite–Northwest, Western Mineral, California Zonolite and Ari–Zonolite. Under these agreements, the licensees obtained exclusive authorization to manufacture and distribute Zonolite products containing asbestos in specific geographic areas.

fornia Zonolite, Ari–Zonolite, Western Mineral and Vermiculite Northwest, the argument concludes, exposure or installation prior to Grace's acquisition of those companies implicates the policies sold by Aetna and General.

Royal argues that its review of 5,430 underlying complaints shows that not one of that number identify a specific product of the Zonolite Company. The majority of these cases, 4,952, identify Grace as a defendant in its own right and not as a successor to the Zonolite Company. Furthermore, Royal, citing *Chatham*, notes that the issue here concerns the identity of the insured rather than the usual issue of whether the policy provides coverage. 334 N.Y.S.2d at 961. Thus, Royal contends that the insured has the burden to show that it is, in fact, an insured under the policy. Not until the insured satisfies this burden, Royal says, does the burden shift to the insurer to show it is not obligated to defend by reason of an exclusion or limiting language in the policy.

This dispute presents a difficult question. Both sides put forth compelling arguments. As Aetna argues, adoption of Grace's position results in an increase in the risk assumed by the predecessor's insurer. Each insurer of a predecessor, for example, would have to handle more claims than it would have absent Grace's acquisitions, Aetna adds, and these claims would include products distributed by entities other than the insured predecessor. The insurers never contracted to assume that increased risk; nor were they compensated for it when they issued the policies. General points to its experience as an example. It insured a small company in the State of Washington, Vermiculate Northwest, employing only fourteen people.[33] Now General, accepting Grace's argument, must defend Grace's operations in Washington and other states.

On the other hand, to accept the insurers' argument would deny Grace a defense in thousands of underlying cases. If an underlying complaint named Grace and any of its predecessors, none of the insurers that sold coverage to them would provide a defense.

To resolve the dispute, we look to *Chatham* which both sides cite. The insurers rely on *Chatham* to show that the insured must identify the predecessor and the injury-causing product. Grace, on the other hand, cites *Chatham* to show that the duty to defend is construed broadly. *Chatham* found that the insured had sufficiently identified the products of the predecessor in order to invoke the duty to defend. The question here concerns whether Grace has sufficiently identified the products of the predecessor to invoke the duty to defend.

*Chatham* relied on two cases, which held that even when a complaint does not state sufficient facts to bring a case clearly within or without the coverage, the insurer is obligated to defend if there is potentially a case under the complaint within the coverage of the policy. *Commercial Pipe & Supply Corp. v. Allstate Ins. Co.*, 36 A.D.2d 412, 321 N.Y.S.2d 219, 221 (4th Dep't 1971); *Brooklyn & Queens Allied Oil Burner Service Co. v. Security Mutual Ins. Co.*, 27 Misc.2d 401, 208 N.Y.S.2d 259, 261 (Sup.Ct., Kings Co.1960). That principle has been followed by the Second Circuit. *See, e.g., Ogden Corp. v. Travelers Indemnity Co.*, 924 F.2d 39, 41 (2d Cir.1991); *Avondale*, 887 F.2d at 1204. Indeed, *Avondale* noted that "an insurer seeking to avoid its duty to defend bears a heavy burden." *Id.* at 1204. It must show "as a matter of law that there is no possible basis in law or fact upon which the insurer might be held to indemnify [the insured]." *Id.* at 1205.

Grace, as a successor to Zonolite, has shown that the underlying cases that allege pre–1963 exposure anywhere in the country are arguably or potentially within the coverage of the policies. Grace had no involvement with asbestos before 1963. Grace is sued because of its acquisitions. Its only connection to asbestos could arise

---

**33.** Vermiculite sold products in five states, Washington, Alaska, Oregon and parts of Montana and Idaho.

out of the activities of Zonolite or Zonolite licensees. The cases brought in the areas serviced by the Zonolite licensees are also potentially within the coverage of the policies. These cases rationally fall within the policy coverage. *Id.* at 1204.

Moreover, given the nature of the underlying complaints, i.e., their lack of specificity, Grace could never, prior to discovery, identify the offending product. To accept the insurers' theory means that Grace would not receive a defense, despite the existence of coverage. That theory places a burden on an insured that it could never satisfy. Thus, we find Grace entitled to a defense.

■ Royal also argues that in the Zonolite acquisition agreement, Grace took exception to any transfer of Zonolite policy assets. Language in the agreement provided that Grace did not assume those liabilities for which Zonolite was otherwise insured. Thus, the argument goes, Grace cannot be the beneficiary of those Zonolite insurance assets affording coverage for insured liabilities. As Grace points out, though, the acquisition agreement expressly provided for the assignment and transfer of all Zonolite policies to Grace. The clause in the agreement that Royal relies on provides only that Grace would not assume liabilities against which Zonolite was insured or otherwise indemnified. It did not affect the assignment of the policies to Grace. Thus, Royal's argument is rejected.

■ Royal next argues that the assignment violates the non-assignment clauses in its policies and results in forfeiture of coverage. The assignment clause in the Royal policy reads: "Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon." Royal recognizes that *Brunswick,* *Imperial,* and *Paxton* did not enforce the identical non-assignment clause, but argues that the assignment has substantially increased its risk and that the clause is not ambiguous. In those cases, the courts found that the assignment did not involve any increase in the risk or hazard assumed by the insurer. *E.g., Brunswick,* 509 F.Supp. at 753. In the present case, Royal

submits, since Grace acquired additional asbestos companies, and specific products are rarely identified in asbestos litigation, it must at least defend a greater number of cases generated by other Grace acquisitions. That argument has some merit. But, as Grace counters, if Zonolite remained in business, Zonolite could be sued directly in virtually every one of the underlying cases alleging pre–1963 exposure to a Zonolite product, whether or not manufactured by a licensee. Furthermore, Grace indicates that all of the entities it acquired distributed Zonolite products.

Royal also argues that its non-assignment clause is unambiguous despite the findings in *Imperial Enterprises* and *Paxton* that the identical clause was ambiguous. Those cases found the non-assignment clause ambiguous when taken together with the merger statute. We have already noted New York's merger statute. Thus, following *Imperial Enterprises,* 535 F.2d at 291, and *Paxton,* 497 F.Supp. at 581, we hold the clause ambiguous in view of the state merger statute.

Accordingly, the insurers' motion for summary judgment on this issue is denied.

*Scope of "Accident" Policies Coverage*

Aetna and Grace dispute the effect of Aetna's policies. Aetna contends that its pre–1966 policies typically covered only injury "caused by accident," as distinguished from "occurrence" policies. Since Grace maintains that asbestos-related bodily injury and property damage are gradual and continuous, Aetna argues that its policies do not provide coverage to Grace. We need not address this issue at this time because the existence of Aetna's policies has not been established. For the same reason, we do not address Aetna's request concerning the Illinois limitations statute regarding California Zonolite and Ari–Zonolite.

So Ordered.